UNITED STATES, Appellee

v

SALADON MARTINEZ, Technical Sergeant, U. S. Air Force, Appellant

11 USCMA 224, 29 CMR 40

224

No. 13,255

Decided February 5, 1960

*Lieutenant Colonel Philip J. Williamson* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel James L. Kilgore.*

*Lieutenant Colonel Francis R. Coogan* argued the cause for Appellee, United States. With him on the brief was *Colonel John F. Hannigan.*

## Opinion of the Court

HOMER FERGUSON, Judge:

Initially, this accused was found guilty by general court-martial of sixteen worthless check offenses, in violation of Uniform Code of Military Justice, Article 134, 10 USC § 934. He was sentenced to a bad-conduct discharge, partial forfeitures, and confinement at hard labor for twelve months. Because of instructional errors affecting the sentence adjudged, the convening authority directed a rehearing before a special court-martial on the sentence alone. At the rehearing, accused was sentenced to a bad-conduct discharge. The convening authority and the officer exercising general court-martial jurisdiction approved the sentence and forwarded the record of trial for review by a board of review. That body affirmed the findings but expressed doubt concerning the impartiality of an officer participating in the post-trial review. Believing the accused had been prejudiced, the board "recommended" to The Judge Advocate General of the Air Force that the record of trial be forwarded to a different con-

vening authority for new post-trial proceedings. Acting upon that "recommendation," The Judge Advocate General of the Air Force forwarded the record of trial to the Commander, Air Photographic and Charting Service, Orlando Air Force Base, Florida, for further review. In the letter of transmittal, Major General Harmon made the following comment:

"1. The Board of Review has completed its review of the record of trial in the case of the above-named accused. I do not deem it appropriate to take action pursuant to Article 67 (b) (2), although the correctness of the determination of the Board of Review that the officer who conducted the post-trial interview had a disqualifying connection with this case is questionable. I have decided not to certify the case to the United States Court of Military Appeals because considerable time has already elapsed in processing it and certification would further delay final action. Under all the circumstances, I have de-

termined that this case should be concluded in the most expeditious manner.

"2. You are hereby advised to take action in accordance with the decision of the Board of Review.

/s/ Reginald C. Harmon
/t/ REGINALD C. HARMON
Major General, USAF
The Judge Advocate General
United States Air Force."

Thereafter, a new review was prepared. Pursuant to its recommendation, the new convening authority approved the sentence. The findings and sentence were again affirmed by the board of review, and we granted acused's petition in this Court on the issues whether he was prejudiced by the receipt in evidence of the deposition of Jose Bello, in which the services of an accuser-in-fact were used as interpreter, and whether he was deprived of his right to an impartial post-trial review by the quoted comments of General Harmon in the letter transmitting the record of trial. These matters, as well as another serious deficiency, will be discussed *seriatim*.

## I

Briefly stated, the evidence tends to establish that the accused, stationed in Ciudad Trujillo, Dominican █ Republic, cashed sixteen worthless checks at the Hotel Paz. Prior to the trial, the deposition of Colonel Jose Bello, a Dominican official and manager of the Hotel Paz, was obtained for use by the prosecution. A Major Greene served as interpreter in the taking of the deposition. Colonel Bello deposed that he knew the accused and had personally examined, initialed and approved for payment the sixteen checks in question. Major Greene was the accused's immediate commanding officer at the time of the offenses; was active in the preparation and preference of charges against the accused; and testified at the trial as a prosecution witness. In a statement made during the Article 32 investigation, Major Greene expressed his belief that accused's misconduct called for "severe disciplinary action."

In an out-of-court hearing at the trial, Major Greene indicated he informally investigated the allegations against the accused; made a full report to his superiors in the United States; gathered pertinent evidence; and arranged to have charges preferred as soon as the accused had made restitution. He also testified that, had his superior directed the accused's immediate transfer from the Dominican Republic, he would have forthwith preferred charges.

Under the circumstances, it can hardly be argued that Major Greene was not an accuser-in-fact. While he did not prefer the formal charges, he indicated an interest in the case which far transcended merely official action. Code, supra, Article 1, 10 USC § 801; Manual for Courts-Martial, United States, 1951, paragraph 5; United States v Gordon, 1 USCMA 255, 2 CMR 161.

In United States v Moeller, 8 USCMA 275, 24 CMR 85, we were confronted with the problem of determining whether the official reporter of a court-martial was disqualified so to act by reason of the fact that he was also the statutory accuser. We were unanimous in our holding that even a nominal accuser might not act as reporter. Speaking for the Court concerning this issue, Judge Latimer stated:

". . . [I]t is to be remembered that a great mass of evidence may be placed in a record, and it is impossible for anyone but the reporter to record accurately all of the testimony. We, therefore, conclude that *it is contrary to the concept of a fair trial* and an adequate review to have an actual accuser assigned as reporter. Likewise, as a general proposition, statutory, or what we shall designate as nominal, accusers should not be detailed as reporters. The potentialities for harm to the system are great if one who appears on the record as an accuser can be a key party to the preservation of the rights of an accused." [United States v Moeller, supra, at pages 276–277.] [Emphasis supplied.]

The Government contends, however, that an interpreter-accuser should be treated differently from a reporter-

accuser. It argues that our decision in United States v Rayas, 6 USCMA 479, 20 CMR 195, indicates that we distinguish between one whose actions in formulating a record import verity and finality and one who merely serves as a translator.

United States v Rayas, supra, does not support the Government's position. There we dealt solely with the problem of testing the *accuracy* of an interpreter's translation. While we pointed out that the right of an accused to monitor the interpreter's action was not so basic that it involved military due process, we were not there confronted with the question of his disqualification.

The reasons advanced for our decision in United States v Moeller, supra, are even more strongly applicable to interpreters, particularly those who assist in the taking of depositions.[1] In the case of a reporter-accuser, counsel is at least to some degree familiar with the proceedings which have transpired. Thus, he has an opportunity upon his examination of the record to determine whether the report of the trial is grossly inaccurate. While we held that possible safeguard inadequate in United States v Moeller, supra, even that degree of protection is totally absent in the case of an interpreter. In the latter instance, counsel is normally unfamiliar with the foreign language in which the witness gives his testimony. Hence, counsel are left entirely at the mercy of the translator. Moreover, where the latter is the accuser, he may, consciously or unconsciously, shade the declarations of a witness in such a fashion that the prosecution's case is substantially strengthened. These considerations lead us to conclude that an accuser, whether actual or nominal, is disqualified from acting as an interpreter in the case in which he is interested. It follows, therefore, that Colonel Bello's deposition should not have been admitted in evidence.

## II

The second issue with which we are confronted concerns the prejudicial effect of General Harmon's comments in the letter transmitting the record of trial for further post-trial proceedings. While we impute no improper motive to The Judge Advocate General of the Air Force, we are certain there is a fair risk that his expression of opinion concerning the propriety of the board of review's action prejudicially affected the accused's substantial right to an impartial consideration of the question of the sentence to be approved.

As the senior military legal advisor in the Department of the Air Force, it can scarcely be contended that General Harmon's opinions do not carry substantial weight with his military subordinates. Thus, his belief that the board erred in its conclusion may well have been interpreted by the Staff Judge Advocate to whom the record was eventually referred to mean that the action which he and his commander were required to undertake was no more than a formality. The accused's entitlement to an impartial post- trial review, however, is a substantial right and the critical first step on the appellate ladder. United States v Wilson, 9 USCMA 223, 26 CMR 3; United States v Griffin, 8 USCMA 206, 24 CMR 16. He is entitled to the completion of this stage without the possibility that it was influenced by the opinion of superior authority. Hence, we unhesitatingly condemn the inclusion of the quoted comments in the letter of transmittal. In reaching this conclusion, we brush to one side the Government's arguments that The Judge Advocate General did no more here than he does by certifying to this Court a question concerning the decision of the board of review and that, in any event, he is entitled to express his opinion of judicial decisions just as any other attorney. While we believe that certification of a decision may be made

---

[1] We have emphasized how deeply the use of depositions cuts into the rights of an accused. United States v Valli, 7 USCMA 60, 21 CMR 186. We note from this record that Colonel Bello's deposition would have been inadmissible except for accused's transfer to a base more than 100 miles from the Dominican Republic for trial.

for a variety of reasons, we are willing to assume herein that it indicates disagreement with the conclusion of the board of review. The process results, however, in our decision on the merits of the question presented. It is the mandate of this Court in such cases which forms the basis of subsequent action, and we dare say that it is unlikely military justice personnel will flaunt the directions contained therein simply because it resulted from certification.

With regard to the second proposition, we at once admit the right of The Judge Advocate General to disagree privately with any judicial decision. His disagreement must not, however, be so expressed that it affects the relief granted in a particular case. Thus, his comments on the propriety of ameliorative action by a board of review have no place in a letter transmitting the record of trial to a convening authority for further action. The enactment of the Uniform Code of Military Justice eliminated the requirement that The Judge Advocate General participate in action by the board of review. With respect to their decisions, his function is now purely administrative, and he must be content to accept their conclusion or to exercise his authority under Code, supra, Article 67, 10 USC § 867, to certify the decision to this Court. Absent that certification, his letter of transmittal should include nothing which undercuts the effectiveness of the relief ordered by the board.

There being a fair risk that the accused's right to an impartial post-trial review was affected by the comments included in General Harmon's letter, we would normally require new post-trial proceedings. As there must be, for other reasons, a complete rehearing, the accused will, if again convicted, receive this relief as a matter of course.

### III

While the point was not granted or briefed, we note from the record and oral argument that the accused's rehearing on the sentence was conducted before a special court-martial although he was originally tried by general court-martial. These courts-martial do not, of course, have coordinate jurisdiction and, in effect, the result is that the trial of accused's case was split between substantially different tribunals. In our opinion, the hearing of a cause cannot be so divided.

In Ex parte Trombley, 78 Cal App 2d 528, 178 P2d 510, affirmed 31 Cal 2d 801, 193 P2d 734 (1948), the defendant was originally brought to trial in one township. The presiding judge disqualified himself and called upon the judge of another township to hear the case. Defendant was convicted and sentenced by the second judge. Following appeal, the conviction was affirmed, and the second judge again sentenced the defendant. The latter sought habeas corpus on the ground that the original judge's court had been increased in rank between the two pronouncements of sentence and that a justice of a court of a lesser rank had no authority to adjudge punishment in a court of higher dignity. The California appellate courts indicated that defendant's claim "may be conceded." In Henry L. Lang Co. v McGarry, 106 NJL 457, 150 Atl 689 (1930), it was held that a judge of the Court of Common Pleas had no power, in the absence of statute, to consider and decide issues in a case pending in the Supreme Court. See also Patchen v Patchen, 364 Ill 178, 4 NE2d 94 (1936).

These considerations cause us to conclude that it is equally improper to conduct a rehearing on sentence before a special court-martial when the initial trial on the merits occurred before a general court-martial. Moreover, it is obvious that the accused is deprived of substantial rights by such a division in the trial of his case. While he may possibly benefit in some cases from the limited sentencing powers of the lesser tribunal, he may be denied the services of qualified counsel and is always required to do without the advantages inherent in the services of a trained law officer. Be that as it may, there is no provision in the Code sanctioning such a procedure, and we are convinced that the rehearing on the sentence before the special court-martial was void.

228

Finally, the Government contends that any objection to the utilization of an accuser on the deposition was waived by circumstances indicating that accused made an informed election not to object to its admission in evidence. While something may be said for that position, see Lau Fook Kau v United States, 34 F2d 86 (CA9th Cir) (1929), the matter is at best debatable. As, in any event, the sentence must be set aside, we believe that the interests of justice will be better served in this case by rejection of the doctrine of waiver and direction of a complete rehearing.

The decision of the board of review is reversed and the record of trial returned to The Judge Advocate General of the Air Force. A rehearing may be ordered or the charges dismissed.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

I dissent.

This case furnishes an excellent example of why the doctrine of waiver is a necessary principle to be used if we are to build an orderly criminal system. Failure to apply the concept in appropriate instances permits persons accused of serious offenses, and without any defense, to toy with the law and put off the day of reckoning until time makes further proceedings futile. That probably will be the history of this case. Here the accused is granted a rehearing some seventeen months after his conviction for an alleged error in admitting testimony when there was no proper objection and the evidence was rendered insignificant by accused's defense and his admissions prior to trial.

On April 10, 1958, charges were preferred against the accused for making and uttering sixteen checks to the Hotel Paz in Ciudad Trujillo, Dominican Republic, during the months of October and November 1957 and thereafter wrongfully and dishonorably failing to maintain sufficient funds on deposit in the drawee bank for payment of them upon their presentment. Major Greene, who apparently becomes the villain in this drama, was in command of the detachment in the Dominican Republic at the time involved and, because of complaints directed to him, he conversed with and attempted to assist the accused in clearing up his financial irregularities. At that time and during the early investigations, there was never any dispute about the negotiation of the checks as the accused repeatedly acknowledged that he made and converted them to cash. Major Greene first assisted the accused but toward the end of November, and because of many misrepresentations by the accused, Major Greene became disenchanted with his task and the problem was referred to higher headquarters and criminal charges eventually resulted. While Captain A. L. Scally was the accuser, for the purpose of this case I am willing to assume that Major Greene may be considered as such.

A pretrial hearing was held on May 5, 1958, and in his report the investigating officer recommended that a deposition be obtained from Mr. Jose P. Bello, who resided in Ciudad Trujillo. The report shows two other items of interest. First, Lieutenant J. Kollar was requested as defense counsel. He was to become available on May 5, 1958, and he, in fact, represented the accused at the pretrial hearing. Second, on May 2, 1958, after having been fully warned of his rights, the accused made the following voluntary and unsolicited statement to the investigating officer:

"I'd like to say one thing. I don't think this warrants a general court-martial. It's not like I was trying to beat these people out of something. If I was trying to do that I would have done something big. That's why, when I found out these checks were coming back, I reimbursed them."

Prior to the pretrial hearing and on April 10, 1958, it was directed that a deposition by oral examination of a witness residing in Ciudad Trujillo be taken. This witness was not Mr. Bello. Trial counsel and Lieutenant Kollar, defense counsel, proceeded under orders to that city and participated in examining the witness. Because of the shortage of qualified personnel, the reporter was used as an interpreter and the combina-

tion made the recording of the questions and answers most difficult. Very little intelligent evidence was obtained, and trial counsel, defense counsel, and the deposing officer discussed the situation and the necessity of obtaining the necessary evidence from other sources. Mr. Bello was suggested but, because of lack of orders and other administrative difficulties at that time, it was determined that his evidence would be obtained by written interrogatories and cross-interrogatories and that Major Greene would be used as interpreter. When interrogatories and cross-interrogatories were prepared, an officer was dispatched to Ciudad Trujillo to act as deposing officer, but Mr. Bello, who was a colonel in the Dominican forces, refused to testify because approval of his superior officer had not been obtained. That difficulty was later ironed out and, when the deposition was finally taken, Major Greene, in accordance with the prior understanding, acted as interpreter. Lieutenant Kollar, who was representing the accused, was familiar with all these preliminary details and the obstacles encountered and, while he was not requested to stipulate to the use of Major Greene as interpreter, he joined in discussing the situation with trial counsel and the acting staff judge advocate of Patrick Air Force Base on several occasions. By tacitly joining with trial counsel in the selection of the interpreter and by failing to raise any objections to the use of Major Greene, who was selected only because he spoke the language fluently, defense counsel led every one to believe he concurred in the choice.

Major Greene's activities in connection with the preliminary investigation were fully developed at the pretrial hearing and so they were brought to the attention of the same defense counsel, who also represented accused at trial. Despite that knowledge and knowing full well the major had been used as an interpreter, when the deposition was offered in evidence at the trial, no objection was raised to its admission on the grounds that a disqualified interpreter had been employed. Rather, at that time, defense counsel stipulated that the witness Bello resided more than 100 miles from the place of trial but raised an objection to the use of the deposition on the ground that the Government had not otherwise established unavailability of the witness. This is the language of his objection:

"The defense objects to the admission into evidence of Prosecution Exhibit 1 for Identification, specifically the deposition. The basis for the defense's objections is that, although we have stipulated that this deponent is in fact beyond one hundred miles away from this installation, this in and of itself is not the sole test for the admissibility of the deposition."

When his objection on the basis stated was overruled, trial defense counsel made this comment:

"Sir, if the objection is overruled because the prosecution has adequately shown that the witness is unavailable, I should like to state a further objection to the admission of this document into evidence because if he is in fact unavailable, the unavailability was caused by the Government and not by the accused, since he was brought from his station to Ciudad Trujillo to this station and then forced to submit to a deposition of this type."

This further objection was overruled and the deposition was admitted.

One other fact of some importance to this issue was before the law officer, and that consisted of an admission that the defense did not desire the personal appearance of the deponent. Defense counsel had prepared cross-interrogatories and was familiar with the fact that Mr. Bello would testify by deposition. Upon arraignment, he made a motion to dismiss the specifications and Charge for failure of the Government to afford the accused a speedy trial. In the course of the arguments on that motion, the following discussion took place:

"TC: Or if the defense counsel requests certain witnesses be made available for him, wherever they may be located, that request we will certainly accept and honor. I think defense counsel should be specifically given that opportunity also.

"DC: Mr. Law Officer, I should like to say the defense does not request a continuance. As a matter of fact, due to the enormous amount of time that has elapsed already, the accused does not want to extend this period any further.

"LO: Very well. Does the defense desire to call any witnesses that will not be present, or obtain any depositions which it does not have?

"DC: No, sir, we do not desire the presence of any witnesses which we do not have already and the trial counsel's remarks indicated perhaps the accused was not prepared to go to trial, however, I should like to point out, the accused is prepared to go to trial."

The original trial was held on July 9, 1958, and, after conviction, the accused was sentenced to a bad-conduct discharge, confinement for twelve months, and forfeitures of $123.33 per month for that period of time. Subsequently, the convening authority granted a rehearing on sentence because of an instructional error. On December 3, 1958, a rehearing was held and accused was sentenced to be discharged from the service with a bad-conduct discharge. No confinement or forfeitures were imposed. The record was forwarded to a board of review in the office of The Judge Advocate General of the Air Force and, so far as I am able to ascertain from this record, the first time any irregularity in taking a deposition was mentioned or assigned as error was in a brief of appellate defense counsel filed with the board on March 11, 1959. Therefore, I conclude it was at least eleven months after the defense knew of the irregularities and after a pretrial investigation and two hearings at the trial level before the defense sought to raise any question about Major Greene's alleged disqualification. The board of review concluded there was no merit to the assignment but sent the record back to The Judge Advocate General with a recommendation the sentence be reconsidered by a new convening authority after he had obtained a new staff judge advocate review. The Judge Advocate General complied with the request and a new convening authority was ap-pointed, a new review obtained, the sentence affirmed, and the case started on its second course through appellate channels. There was no complaint about the deposition at the second hearing before the board of review, and nothing further was done in that regard until the case reached this Court. In a petition filed on July 8, 1959, the error was resurrected.

My associates now reverse the findings and sentence for an irregularity, objection to which could and should have been made a matter of record some eighteen months ago. Had that been done, corrective action could have been taken with little inconvenience to either party. The reason no issue was raised either before or at trial is obvious, for during the early stages of the proceedings the testimony in the deposition was unimportant to the theory of the defense. Moreover, the irregularity was such that had it been called to the attention of the law officer or appropriate military authorities, it could have been purged. Of course, that would have accomplished nothing beneficial to the accused, for the identical evidence could have been obtained with another interpreter. And to do that would have necessitated a delay, which the accused expressly claimed he did not want.

The reason I say the evidence contained in the deposition was unimportant to the theory of defense is this. On March 17, 1958, the accused executed a voluntary statement in which he made the following disclosures:

"The photostatic checks shown to me by Sgt Wade are the checks that I wrote.

"I wrote home to my father in Colorado to reopen my account with the First State Bank of Walsemburg. My account had been closed since approximately March of 1957. While my account was open, I sent money to the bank from the bank in Ciudad and also my folks deposited money from a $50.00 Class E allotment which had been made out to them since 1949.

"I obtained blank checks in various places and cashed them at the Paz Hotel. On or about the middle of

**231**

October 1957, I started having a good time gambling and drinking in Ciudad, and that is when my debts went up above my income. When my debts went above my income, I wrote to my father on 1 October 1957, and told him to deposit some of the Class E allotment to my account. I didn't get a reply as to whether or not he had deposited the money. I didn't know whether or not he had received the letter, so I went ahead and wrote checks. All the money I cashed checks for was for gambling and drinking and for a good time. About the middle of October, I started going out more.

"When the Paz Hotel received the first check that was no good, I told them to hold it and I would make it good. So I wrote home for money. My father said that they didn't have it at the time. Then I wrote to my brother and also called him up. He sent me $450.00."

In addition to the foregoing admissions, at the pretrial hearing accused made the statement hereinbefore quoted in which he admitted making, uttering, and cashing the checks. Thus at the time of trial, accused had twice in formal investigations voluntarily admitted making and cashing the checks set out in the specifications. Moreover, his consultations with Major Greene and their joint activities in redeeming the returned checks remove all doubt about the identity of the person issuing them.

Accused's theory of defense, if he had any, was simply and solely that he uttered the checks under the mistaken belief he had or would have money in the bank to cover the checks. To succeed in that sort of defense, he could not deny the facts which would be necessary to support this hypothesis. He was not charged with issuing the checks with intent to deceive, so the only real issue in the case revolved around his failure to have or place funds on deposit to pay the checks. In this regard, all I need say· is that if the deposition testimony shed any light on that question, it was favorable to the accused for the deponent stated the checks had been re-

232

deemed. Parenthetically I note that aside from accused's pretrial statement which I have quoted, the deposition contained the only bit of evidence which could possibly be considered favorable to the accused. Its admission, therefore, could hardly have adversely influenced the court-martial.

My associates use United States v Moeller, 8 USCMA 275, 24 CMR 85, as authority for the position they take in the instant case. I do not believe it supports their views, but I need not get into that controversy for waiver was not therein considered. In that instance, the case was tried before a special court-martial and the accused was not represented by a lawyer. We have rarely, if ever, applied the doctrine of waiver when that situation exists, but not so when a qualified lawyer fails to object to a pretrial irregularity of which he had actual knowledge at the time of the hearing. Certainly, there is no merit to the contention that this accused was denied a fair trial by the admission of this deposition. The testimony contained therein could not be false, unreliable, or rebutted. There is not the slightest suggestion the interpreter had any reason to color the answers, and the information obtained is corroborated by the written exhibits and accused's admissions. He so firmly fixed this element of the offense that only wishful thinking could support any contention to the contrary.

Accordingly, I am unable—using the language of my associates—to determine wherein "the matter is at best debatable," or how "the interests of justice will be . . . served . . . by rejection of the doctrine of waiver." I can only conclude this case is being reversed when proper and orderly appellate procedure dictates that accused complained too late.

The second issue has to do with the letter written by The Judge Advocate General of the Air Force when he returned the record to a new convening authority for further action. The disposition of the other issues in the majority opinion renders a discussion of this question unnecessary unless it is desired to alert The Judge Advocates

General of the services to the effect that they should not comment on the action they take.

I believe my associates overlook the history of military law and misinterpret the provisions of the Code when they take The Judge Advocate General entirely out of judicial channels. In my opinion, the Code permits him to function in a dual capacity. I first point out that under Article 73, 10 USC § 873, he is authorized to consider and act on petitions for new trial and under Article 69, 10 USC § 869, he is authorized to review the records of trial in certain cases. Surely when he performs those duties he is acting in a judicial capacity.

More important, however, insofar as this case is concerned, Article 66(e), Uniform Code of Military Justice, 10 USC § 866, provides as follows:

> "The Judge Advocate General shall, unless there is to be further action by the President, the Secretary concerned, or the Court of Military Appeals, instruct the convening authority to take action in accordance with the decision of the board of review. If the board of review has ordered a rehearing but the convening authority finds a rehearing impracticable, he may dismiss the charges."

And Article 67(b)(2) of the same Act, 10 USC § 867, requires that we review cases which The Judge Advocate General orders forwarded to us. From these latter two Articles, it appears that when a board of review has published its decision, The Judge Advocate General has the option of returning the record to the convening authority with certain instructions or certifying the case to this Court for further hearing. When this particular record reached The Judge Advocate General, he had that choice and he elected to return the same to the convening authority. He did not suggest any desired result to those who were to review the record, but he did state he had some reservations about the legal correctness of the board of review's decision which held that the officer who conducted the post-trial interview was disqualified. That was a legal decision and The Judge Advocate General was merely commenting in a field in which he is authorized to act. He saw no point in having us make a determination when the error found by the board of review could be corrected and the irregularity purged with dispatch. In spite of any reservations, he went on to direct the convening authority to follow the mandate of the board of review and, in the absence of some evidence to the contrary, I assume the convening authority did just that.

Further, it is of some interest that the particular board of review which was the tribunal mentioned by The Judge Advocate General passed on this very question and reached the conclusion that the comments set out in the letter were not an expression of displeasure and that they would influence neither a staff judge advocate nor the convening authority. I reach the same conclusion but, in addition, I take the position that when The Judge Advocate General is performing his duties under Articles 66 or 67, he may set out the reasons for his action so long as he does not interfere in discretionary fields of reviewing authorities. In the case at bar, he expressed no opinion on the appropriateness of sentence. At the worst, he did no more than say he had some misgiving about the conclusion that an officer who made the post-clemency review was disqualified, but even so that the convening authority was to proceed on the basis that the board of review decision fixed the law. I fail to see how this advice was erroneous or prejudicial.

Finally, an issue not advanced by the accused, not granted review by this Court, and not briefed or argued is seized upon to shore up what obviously is a weak decision. While I do not believe we should decide such an important issue without giving the parties an opportunity to be heard—and I point out that both may be prejudiced by the holding—I answer the arguments of my colleagues.

First, it would be to ignore the obvious to overlook those differences between the military system and its civilian counterpart which often make comparisons between the two abhorrent. Even apart from that, however, I am sure the state cases relied upon by my

**233**

brothers give them little support. In my view they are inapposite. Among other things, I suggest the interested reader will find that neither California appellate court ruled as the majority imply. To the contrary, both expressly reserved a holding on the question my associates deem pertinent. And not only do I believe the Code permits the procedure here employed, but this case —unlike the cited New Jersey opinion —was not pending in another court at the time of the rehearing. Thus, I cannot brand the procedure employed here as improper on those grounds. Nor am I concerned because the Uniform Code does not expressly spell out authority for this procedure for, as will be more fully developed hereinafter, I am certain it does grant authority to special courts-martial to try cases of this type. In this regard, I might mention that the Code does not specifically provide for rehearings on sentence only, yet by our decisions we authorized that practice. See United States v Miller, 10 USCMA 296, 27 CMR 370, and cases therein cited. Furthermore, I point out that courts-martial are not continuing tribunals. Indeed, the law requires that rehearings be before a court composed of different members. Article 63(b), Uniform Code of Military Justice, 10 USC § 863. Thus, it is obvious that it was necessary to appoint an entirely new court to impose punishment on accused; the previous court—even if still available—could not lawfully do so. And I suggest it would be absurd to hold that a rehearing on both findings and sentence can be taken from a general court-martial and referred to a new special court, but a separate and divisible part thereof cannot. Certainly, neither the Code nor any provision of the Manual, or for that matter any other authority to which my attention has been invited, proscribes the procedure employed. Rather, the convening authority who ordered the rehearing on sentence was, without question, competent to convene a special court. Article 23(a)(1), Uniform Code of Military Justice, 10 USC § 823. And inasmuch as the case at bar is noncapital, and since there is no mandatory punishment for accused's of-

234

fenses which is beyond the authority of a special court-martial to impose, there can be no question but that the instant case falls within the jurisdiction of a special court. Article 19, Uniform Code of Military Justice, 10 USC § 819. Thus, I am unable to join in what is apparently a holding that a special court-martial is without jurisdiction to proceed under the circumstances here involved. Surely my associates do not suggest, contrary to my assertion made above, that if a rehearing on both findings and sentence were involved, a special court-martial could not hear the case. We have often stated that findings and sentence were separate and distinct, we have divided them for purposes of rehearing, yet if proceedings initiated before a general court may be referred to a special court-martial for a retrial on both, I wonder why jurisdiction is lacking for a rehearing limited to sentence alone.

Before leaving this issue, I deem it appropriate to comment on prejudice, for the principal opinion states that the accused is deprived of substantial rights through the procedure herein employed. I question that as an abstract proposition but, when applied in this case, it is clearly erroneous. Quite to the contrary, I suggest the accused's real loss here is that the majority divest him of the benefit of a reduced ceiling on maximum punishment occasioned by the jurisdictional limitation of special courts-martial. Under their holding, he can be retried on sentence without the benefit of the reduced sentence imposed by the special court. And contrary to my brothers' suggestion, which implies otherwise, I invite attention to the fact that the accused was represented at the rehearing on sentence by a qualified lawyer. Moreover, there is a verbatim transcript of the rehearing proceedings, and yet no one suggests any error was committed in the hearing or that accused's rights were abused. If for the moment I cast myself in the role of a defending lawyer, I am certain I would recommend to any accused that, if confronted with a similar situation, he rejoice at being helped by the referral to the inferior court.

For the foregoing reasons, I must disagree with my brothers' conclusions.

I would affirm the decision of the board of review.