UNITED STATES, Appellee

v

WILLIE A. SMITH, Sergeant, U. S. Army, Appellant

13 USCMA 553, 33 CMR 85

No. 16,065

March 29, 1963

*First Lieutenant John G. Milano* argued the cause for Appellant, Accused. With him on the brief were *Colonel W. H. Blackmarr, Lieutenant Colonel*

Ralph Herrod, Captain Richard A. Baenen, Captain David M. Gill, and Captain Samuel J. Rozel.

Captain Jerome Nelson argued the cause for Appellee, United States. With him on the brief was Lieutenant Colonel Francis M. Cooper.

## Opinion of the Court

KILDAY, Judge:

The appellant was tried by general court-martial in Germany on charges of premeditated murder, felony murder and robbery, in violation of Articles 118 and 122, Uniform Code of Military Justice, 10 USC §§ 918 and 922, respectively. He was found guilty as charged and sentenced to dishonorable discharge, total forfeitures, and confinement at hard labor for life. Intermediate appellate authorities have approved the findings and sentence without modification.

The facts briefly are that Master Sergeant Krupowicz, who was well known to carry large sums of money, was found murdered in his bathtub and his money missing. Thereafter, accused and his wife, who had never had any money, were suddenly and inexplicably affluent. Also, accused was seen burning bloodstained khaki trousers. In his signed statements, duly admitted into evidence, accused admitted knowing the deceased and going to his house on the evening in question to repay a loan of four dollars. While there he allegedly had a fight with Krupowicz over a derogatory remark accused made concerning the wife of the deceased. During the fight he struck Krupowicz causing his nose to bleed with the result that blood got on the accused's trousers. Later he burned these trousers. He denied that he killed Sergeant Krupowicz.

Numerous assignments of error have been made by appellate defense counsel. We shall not report them fully, but shall discuss them substantially in the order raised. In connection with those discussed, we shall recreate only the necessary factual background. Certain asserted errors were pressed more strongly than others, but we have considered all of them.

## I

THE LAW OFFICER ERRED IN DENYING THE DEFENSE REQUEST FOR A NEW PRETRIAL ADVICE.

At the outset of the trial, defense counsel made a number of motions among which was a motion for appropriate relief, in the form of a new pretrial advice, asserting as grounds therefor that "compliance with Article 34 of the Uniform Code of Military Justice, [10 USC § 834,] by the Division Staff Judge Advocate . . . Lt. Col. Mort D. Wilber, has been an empty ritual because . . . [he] is, in fact, [though not in name,] the accuser in this case. . . . Being the accuser, Lt. Col. Wilber could not fairly or impartially review the record as then constituted and render to the convening authority an impartial, unbiased advice." The defense contends that the division staff judge advocate participated in the pretrial activities to such an extent that he became a "combination prosecution advocate and investigating officer," thereby disqualifying himself from acting in the capacity required under the Code.

By law, the final responsibility for determining whether charges are to be referred for trial rests with the convening authority. Article 22 (a), Uniform Code of Military Justice, 10 USC § 822; Manual for Courts-Martial, United States, 1951, paragraph 5; United States v Greenwalt, 6 USCMA 569, 20 CMR 285. However, under Article 34 of the Code, the convening authority is required, "Before directing the trial of any charge by general court-martial, . . . [to] refer it to his staff judge advocate or legal officer for consideration and advice." The Manual, paragraph 35c, adds the requirement that this advice be in writing and that it contain findings

concerning compliance with Article 32 of the Code, 10 USC § 832; whether offenses are properly alleged; and whether the evidence supports the charge.

As we observed in United States v Greenwalt, supra, the review by a legal advisor is a valuable pretrial protection to an accused. Generally speaking, it assures full and fair consideration of all factors. It augurs against precipitate or ill-considered action, or cases being ordered to trial due to inadvertence or mistake. See also United States v Brown, 13 USCMA 11, 32 CMR 11; United States v Schuller, 5 USCMA 101, 17 CMR 101; and separate opinion of Judge Ferguson in United States v Foti, 12 USCMA 303, 305, 30 CMR 303, 305.

The staff judge advocate, in carrying out his responsibility under this section of the Code, must act ■■■■■ ■ in an impartial and independent capacity. United States v DeAngelis, 3 USCMA 298, 12 CMR 54; United States v Gunnels, 8 USCMA 130, 23 CMR 354; United States v Mallicote, 13 USCMA 374, 32 CMR 374. Since, under the Code, he has several functions to perform he must use his intelligence and experience to keep from becoming at one stage of the proceedings so personally involved in the outcome as to preclude him from acting in a later stage. United States v Gunnels and United States v Mallicote, both supra; United States v Turner, 7 USCMA 38, 21 CMR 164; United States v Haimson, 5 USCMA 208, 17 CMR 208.

But the appellant alleges that the staff judge advocate did become personally involved, was aware of his disqualification under the Code, as evidenced by the fact that he did not prepare the post-trial review, and that this disqualification applied also to the pretrial advice.

Not every prior connection with a case is disqualifying. In United States v Lee, 1 USCMA 212, 2 CMR 118, we held that trial counsel's previous connection with the case as accuser did not disqualify him. And in United States v Hayes, 7 USCMA 477, 22 CMR 267, it was decided that the earlier role of trial counsel as staff judge advocate was not so incompatible with his duties at the trial as to make him ineligible to serve. Legal advice to the investigating officer by the staff judge advocate does not estop the latter from subsequent review of the same case. United States v DeAngelis, supra.

Under Article 6(c) of the Code,[1] 10 USC § 806, relied on by the appellant for his contention in this case, the staff judge advocate is precluded from acting as advisor to any *reviewing authority* if he has previously acted as a member of the *prosecution*. The appellant would have us extend this prohibition to the pretrial advice to the convening authority as well, alleging that "The framers of the Manual for Courts-Martial apparently interpreted the provision to include pretrial activities." Paragraph 35b of the Manual reads in part as follows:

". . . No person who has acted as investigating officer, law officer, or member of the court, prosecution, or defense in any case shall subsequently act as staff judge advocate or legal officer in the same case."

Particular attention is drawn by appellant to the fact that this provision is almost identical with the wording of Article 6(c) of the Code, except that it leaves out the phrase "to any reviewing authority," and "It would be illogical to interpret the use of 'reviewing authority' . . . as limiting the restrictions to post-trial proceedings."

Appellate defense counsel's logic and their conclusion as to the apparent interpretation by the framers of the Manual might be more persuasive were it not for the fact that the remainder of paragraph 35b, which was not quoted

<hr />

[1] "No person who has acted as member, law officer, trial counsel, assistant trial counsel, defense counsel, assistant defense counsel, or investigating officer in any case may later act as a staff judge advocate or legal officer to any reviewing authority upon the same case."

**557**

by appellant, reads as follows "See Article 6c." It is patently obvious that in drafting this particular paragraph, the framers of the Manual were particularly concerned at this point with Article 6(c) of the Code. Whether they also had in mind the interpretation accredited to them by the appellant must remain pure speculation, for they are markedly silent in this regard.

In furtherance of their allegation that the staff judge advocate was disqualified from advising the ▆▆▆▆ ▆ convening authority, appellate defense counsel call our attention to the fact that the charges and specification were prepared and drafted personally by Lieutenant Colonel Wilber and given to the non-commissioned officer in charge of courts and boards, Sergeant Nordgren, to put in proper form with instructions that they were to be returned for final checking.[2] Lieutenant Colonel Wilber thereafter directed that the charges be taken to the accused's commanding officer to sign as accuser and, subsequently, when submitting the pretrial advice to the convening authority, he made "a hollow ritual" of the proceedings by his *pro forma* statements (a typewritten edition of a mimeograph form) that "The specifications allege offenses under the Code" and "The allegation of each offense is warranted by the evidence indicated in the report of investigation." Appellant contends that "Since the staff judge advocate had personally drawn the charges, based on his personal examination of the record prior to investigation under Article 32 of the Code, his action in signing the advice was no more than an empty gesture. There was no need for examination for he was reviewing his own handiwork."

In support of their position, counsel cite our decision in United States v Renton, 8 USCMA 697, 25 CMR 201, where we held that the law officer, who, prior to trial, had assisted in the preparation of the charges, should have disqualified himself from sitting at trial. There we stated that:

". . . Human nature being what it is, the very fact of being called upon to condemn or countenance one's own workmanship cannot create a healthy outcome and less so when the outcome concerns the accused's denial of substantial rights. Cf. United States v Mortensen, 8 USCMA 233, 24 CMR 43. Such activities on the part of a law officer are not the 'stuff' that adversary proceedings are made of." [8 USCMA at page 701.]

Were we here confronted with this same situation we would undoubtedly again so hold, for there is no question as to the need for impartiality on the part of the law officer, who, in essence, is the military counterpart of a civilian judge. Hearings before the House Armed Services Committee on H. R. 2498, 81st Congress, 1st Session, page 607. He has but one function, that is, to preside independently and objectively at *trial*. Quite properly, a law officer has no business presiding at a trial based on charges which he has written.

But the staff judge advocate is not the law officer. The former, by law, is empowered to make such corrections in the charges and specifications as are necessary to insure that they are correct and conform to the substance of the evidence contained in the report of the investigating officer. Article 34(b) of the Code, supra.

". . . Whenever a report of investigation fails to disclose an essential element of the offense charged, the staff judge advocate must direct the attention of the investigating officer to the deficiency. If there is, in fact, no evidence of that element available, a proper reason for dismissing the charge arises. If it is available, it should be obtained and made a part of the report." [United States v DeAngelis, supra, 3 USCMA at page 305.]

Not until he is satisfied as to the correctness of the charges and specifications is he in a position to properly discharge his responsibility to the convening authority.

---

[2] Nordgren testified that at no time did he feel Lieutenant Colonel Wilber did anything more than advise.

The fact that he personally drafted the charges prior to the Article 32 investigation does not deter us. As a unanimous Court previously stated in United States v Hayes, supra: "In a general way, the position of staff judge advocate can be likened to that of a district attorney." He must be available to assist those who work under his direction. As a factual matter, in the case at hand, there were no assistants available to assist the courts and boards noncommissioned officer in this chore. Major Seibert had already been decided upon as a trial counsel. As to the three lieutenants in his office, Lieutenant Colonel Wilber testified that from the outset he wanted "to do my best to keep them clean on this case so they won't be disqualified." As events transpired, his judgment in this respect was excellent. There were three lieutenants in the office of the staff judge advocate. Ultimately, all of them became involved in this case—one on behalf of the Government and two on behalf of the accused. This was a complicated and highly important case—a man's life was at stake. Someone in the command had to furnish legal assistance and only the staff judge advocate himself was available.

We have frequently commented upon the duality of functions which devolve upon the staff judge advocate by reason of his position in the command and under the Code. The many cases cited above bear this out. This duality of character is itself a creature of statute and the military must live with it.

The appellant does not attack the pretrial advice as such but, rather, argues that he is prejudiced because of an alleged multiplicious pleading. We have previously held and now reassert that the Government may properly charge the same criminal act in different ways to meet the exigencies of proof. United States v Drexler, 9 USCMA 405, 26 CMR 185 (citing paragraph 26*b* of the Manual, and Federal cases); United States v Middleton, 12 USCMA 54, 30 CMR 54. If the specification were alleged for the purpose of deliberately exaggerating the accused's wrong so as to mislead the convening authority as to its seriousness, there might be a question of perversion of the court-martial processes. United States v Middleton, supra. United States v Wille, 9 USCMA 623, 26 CMR 403.

Here we find no effort to mislead. Each of the homicide offenses charged could have been punished by the imposition of the supreme penalty. The perpetration of the robbery should be charged in a separate specification. See paragraph 197*g* of the Manual.

There is no fair risk that the convening authority was persuaded to order a general court-martial by the manner in which the charges and specifications were drawn.

The real function of the staff judge advocate in the pretrial advice is twofold: To determine whether there is sufficient evidence of a crime to recommend the case for trial, and if so the type of court-martial which shall hear the case. Viewed in the light of the evidence in this case, we find it impossible to believe that anyone else would have recommended action other than was recommended by Lieutenant Colonel Wilber.[3]

Having found Lieutenant Colonel Wilber not disqualified by the Code or by the Manual, we next look to the record to determine the reason for his failure to prepare the post-trial review. There we note that he testified five different times, during the course of the trial, on motions made by the *defense*. Because of this activity, he

---

[3] In this regard, it is noted that in any trial for violation of Article 118(1) and 118(4) of the Code, an accused, if found guilty, "shall . . . [be sentenced to] death or imprisonment for life." No lesser punishment for these offenses is imposable. Inasmuch as no court-martial inferior to a general court-martial is empowered to impose a sentence of this magnitude (Articles 19 and 20 of the Code), such charges must be referred to a general court-martial if they are to be tried at all.

deemed it unwise to be the "judge [of] his own actions, decisions, and credibility in this case" and accordingly disqualified himself. The record of trial was forwarded to the Commanding General, VII Corps, and the post-trial review was conducted by the staff judge advocate of that command. We view this action as strongly indicative of a desire for an impartial post-trial review rather than a tacit admission of pretrial involvement.

We have minutely examined the chronology of pretrial activities by Lieutenant Colonel Wilber, advanced by the appellant in support of this allegation, and find it to contain nothing not within the scope of the staff judge advocate's responsibilities under the Code. We, therefore, hold this allegation to be without merit.

## II

THE LAW OFFICER ERRED IN DENYING A MISTRIAL AFTER INACCURACIES IN INTERPRETATION WERE DISCOVERED.

During the testimony, in German, of two prosecution witnesses, three irregularities in translation were discovered by court members and defense counsel. The latter moved for a mistrial, asserting that the discovered errors indicated the interpreter had not been translating the testimony accurately. The motion was denied and the law officer directed that an interpreter be provided for defense use. Thereafter, whenever a witness testified through an interpreter, the defense had the assistance of its own translator.

The three irregularities are as follows:

(1) The word "lief" or "laufen" in high German means "running" but in low Schwabiner German it means "walking." A German witness, Horst Stelzer, testified that he observed the appellant burning certain items of clothing in a field a few days after the death of the victim. In describing what accused did when he noticed that he was being observed, Mr. Stelzer used the word "laufen." The interpreter translated "laufen" as "running." A court member requested

and received the above-noted explanation of the German variations in meanings of the word. When this difference was explained to the witness, he asserted positively he intended to convey the idea that the accused "walked away" from the fire and hid in the cornfield. He denied that the accused ran away or that he intended such a meaning be obtained from his words.

(2) and (3) Prosecution witness Stassny was the driver of a garbage truck. His partner was Herr Maibaum. It was to Maibaum that accused gave the bloody trousers. During his testimony Stassny, on one occasion, used the name "Maibaum" and the interpreter translated it as "my colleague." On another occasion Stassny mentioned the name "Smitty" (the accused Smith) and it was translated as "that man." Both of these instances were noted by defense counsel and called to the law officer's attention.

Appellate defense counsel argue that since a recording of the actual testimony in German of these witnesses is not available, it is absolutely impossible to determine how many other irregular translations were made.

Of the three irregularities noted by defense counsel, only one, the translation of the word "laufen" as "running," is of any significance. "Maibaum" *was* the "colleague" of Stassny. And, inasmuch as the accused was named Smith, the translation of Stassny's use of the name "Smitty" as "that man" did little to change the meaning of his testimony. No one can dispute the applicability of these latter translations.

We are left then with one known mistranslation as to whether the accused ran or walked away from ▆▆▆▆ ▋ the fire in his effort to "hid[e] in a cornfield." The witness himself clarified this matter and the court-martial clearly was informed that the accused "walked away." Of far greater significance is the testimony relative to appellant's action of *hiding* in the cornfield subsequent to leaving the fire. No complaint is made of this translation and we can assume that appellant is satisfied therewith. It seems doubtful, under

the circumstances of this case, that the members of the court-martial would be overly impressed or influenced in their judgment by the haste or leisureliness with which accused proceeded to protect himself from the gaze of passersby. We find here no prejudice to the accused. United States v Rayas, 6 USCMA 479, 20 CMR 195; United States v Martinez, 11 USCMA 224, 29 CMR 40; Lujan v United States, 209 F2d 190 (CA 10th Cir) (1953); People v Jackson, 53 Cal 2d 89, 346 Pac 2d 389 (1959), cert den 362 US 977, 4 L ed 2d 1013, 80 S Ct 1063.

We are asked by appellant to set aside the verdict and direct a rehearing on the ground that absent a recording of the actual testimony in German, "it is absolutely impossible to determine how many other . . . [irregular translations] were made." In addition, it is alleged that this interpreter had been called upon previously to interpret the testimony of the same witnesses several times during earlier investigations and interrogations, thus "open[ing] the way for the interpreter, either consciously or unconsciously, to answer the questions based upon this prior testimony only or in combination with the reply in court." Appellant claims that the factual situations present in United States v Moeller, 8 USCMA 275, 24 CMR 85, and United States v Martinez, supra, where we found error notwithstanding the fact that no specific incidents of incorrect transcription or translation were developed, are analogous to the case at bar and hence there is no need to detail additional word substitutions.

We are unable to agree with these positions. Originally, we note that Mr. Manko, the interpreter, had served in that capacity for some fourteen years and the defense made no objection at the time of his appointment by the court despite its awareness of his previous involvement in this specific case. Having failed to object at the proper time, he cannot successfully urge this ground on appeal. United States v Dupree, 1

USCMA 665, 5 CMR 93; United States v Masusock, 1 USCMA 32, 1 CMR 32; United States v Wolfe, 8 USCMA 247, 24 CMR 57. The decision as to the competency of an interpreter rests in the sound discretion of the court. Objection to the appointment or continuance of the interpreter must be definite and timely. State v Sauer, 217 Minn 591, 15 NW2d 17 (1944).

Upon discovery of the above-related irregularities, the law officer quite properly provided the defense with its own interpreter, who remained present to assist the defense for the balance of the trial. See Annotation, Use of interpreter in court proceedings, 172 ALR 923, 949, subsection V a, citing Rex v Walker, 15 BC 100 (1910), the trial of Queen Caroline. No objection was made to the continued use of Mr. Manko. Since no issue of irregularity is raised as to translations made subsequent to the appointment of an interpreter for the defense, it is presumed that the defense is satisfied therewith.

We are, therefore, concerned only with appellant's *speculation* that there might possibly be other instances of irregularity in the previous testimony furnished through the interpreter; however, counsel are allegedly unable to produce evidence thereof "Since a recording of the witnesses' actual testimony in German is not available."

"Error is not to be presumed, but must be made affirmatively to appear by the party asserting it." Wabash Ry. Co. v Bridal, 94 F2d 117, 121 (CA 8th Cir) (1938), cert den 305 US 602, 83 L ed 382, 59 S Ct 63 (1938), citing numerous Circuit and one other Supreme Court case.

The burden is on the party alleging error to show it affirmatively on the record. Earle v Myers, 207 US 244, 52 L ed 191, 28 S Ct 86 (1907).

In a petition for new trial based on an alleged erroneous translation, the Supreme Court of New Mexico stated that:

". . . In such a case, where it appears that the complaining party

561

is aware at the time that the interpretation of the evidence is not correct, it is incumbent upon him to call the court's attention to such erroneous translation and ask to have it corrected, and where he has not such knowledge at the time, but afterward becomes aware of the fact, he must set out all the facts in his motion for a new trial, pointing out therein specifically the evidence erroneously translated, and support such contention by affidavit or proof, so that the trial court can intelligently pass upon the question. Territory v Hicks, 6 NM 596, 30 Pac 872; Territory v Yee Dan, 7 NM 439, 37 Pac 1101." [State v Cabodi, 18 NM 513, 138 Pac 262 (1914).]

In the case at bar, although the questions and answers in German are not on the record, they are ▮▮▮▮ there in English and if the appellant believes error is present it is incumbent upon him to make a proper showing thereof, specifically denoting any incorrect translations. Lacking this proof, we are not constrained to grant a rehearing on speculation.

### III

THE LAW OFFICER ERRED IN ADMITTING INTO EVIDENCE PROSECUTION EXHIBIT 34 AND THAT PORTION OF PROSECUTION EXHIBIT 39 SEIZED DURING THE ILLEGAL SEARCH OF THE APPELLANT'S HOME ON JULY 6, 1960.

Prosecution exhibit 34 was a pair of low quarter shoes seized by military criminal investigators from the accused's home on July 8, 1960. Prosecution exhibit 39 consisted of two pairs of combat boots, one "old" and one "new." The "new" pair, with which we are concerned in this assignment of error, was seized during a search of accused's home on July 6, 1960.

There is no dispute about the manner or circumstances under which this evidence was secured. Factually, it appears that the accused and his German wife resided in off-post quarters on the German economy. At about midnight on July 5, 1960, as they returned home together, the accused was apprehended by Criminal Investigation Detachment agents and German police, searched, handcuffed, placed in a police car, and taken to Flak Kaserne, about two or three miles from his residence. No explanation for the arrest was given to the wife.

On the following morning, about 7:15 a.m., July 6th, CID agents and German police met at accused's home. A German police officer, Stuhler, told Mrs. Smith, " 'We come with the CID and they make a house search with you.' " He did not ask permission to enter or to search, nor did he have a warrant. The other German policeman, Meyer, told her, "there would be a search." Mrs. Smith made no objection. The German police did not participate in the search but remained in the living room with Mrs. Smith as they "didn't know what was concerned with the search . . . and since we had no instructions."

CID Agent Flower testified that he asked Mrs. Smith if they could search and she consented; however, this was after the German police had spoken with her. Neither the CID agents nor the German police had a warrant or accused's permission to search. No one told Mrs. Smith that her husband was suspected of murder and robbery or where he was at the time of the search. In response to her inquiry as to the purpose of the search, Agent Flower told her they were "looking for money, wallet, papers, or anything that would connect the house with *the incident* that we were investigating." (Emphasis supplied.) When she asked officer Meyer what was going on, he told her, "There will be a search." While in the house, Flower seized the pair of "new" combat boots.

On the afternoon of July 8th, two CID agents returned to the accused's residence and told Mrs. Smith, " 'We are back here, we'd like to search your house again.' " She said, " 'Very well, come on in.' " During this search prosecution exhibit 34 was seized. The agents did not discuss the search with accused or secure his permission, they had no warrant, nor did they have permission from accused's command-

ing officer. The accused was not present during the search, nor was Mrs. Smith advised of his whereabouts or of the charges against him.

Appellant contends that these searches were illegal and the evidence seized therein inadmissible, primarily on the grounds that Mrs. Smith had no authority to waive accused's constitutional right against incrimination.

Conceding that the civilian jurisdictions are divided on the question of the implied authority of a wife to consent to a search of her husband's property (47 Am Jur, Searches and Seizures, § 72, page 549), appellant submits that "the better rule is that of the majority, barring [such] searches." But, appellant continues, assuming, *arguendo*, a wife may authorize or consent to a search, the permission granted here was not "consent" but mere acquiescence to color of authority or, in the alternative, the consent was "obtained under implied coercion." In view of our holding below, we need not decide which is the "better rule."[4]

"When consent to a search is asserted, it must be shown by 'clear and positive testimony.' United States v Berry, 6 USCMA 609, 20 CMR 325. The burden of proof is upon the Government. It is an especially heavy obligation. . . . Judd v United States, 190 F2d 649 (CA DC Cir) (1951); United States v Wallace, 160 F Supp 859 (DC) (1958). . . . Each case must be decided upon its own facts, with precedents being 'at best, of doubtful value.' United States v Berry, supra, page 613; United States v Wilcher, 4 USCMA 215, 217, 15 CMR 215." [United States v Justice, 13 USCMA 31, 32 CMR 31.]

In United States v Alaniz, 9 USCMA 533, 26 CMR 313, this Court had occasion to review numerous cases concerning actual "consent" as opposed to "peaceful submission" to color of authority. There we reaffirmed our previous adoption (United States v Wilch-

er, 4 USCMA 215, 15 CMR 215) of the rationale in Judd v United States, 190 F2d 649 (CA DC Cir) (1951), to the effect that "before a court holds a defendant to have waived his protection under the Fourth Amendment, there must be *convincing* evidence to that effect." (Emphasis supplied.)

Here, we do not find such "convincing evidence" or "clear and positive proof." The German officers, who talked with Mrs. Smith before the American military authorities, told her "there would be a search" and " 'We come with the CID and they make a house search with you.' " Mrs. Smith was a German national and under German law, according to unrebutted testimony of the German policeman Stuhler, a search could be conducted without a warrant "if the suspicion is strong, is sufficient, and a warrant cannot be obtained, especially during the night." In such a situation and considering the events of the previous evening, it seems quite likely that Mrs. Smith "consented" to the search in the belief that she had no choice when faced with this "color of authority."

The same rationale applies to the subsequent search by the CID agents alone on July 8th. The fact that they were not accompanied by German police at that time is not controlling. Nor was her invitation to enter, when they told her "we'd like to search your house again," so "freely and intelligently" given as to constitute consent, when considered in context with the preceding activity. "[I]f the Government alleges their absence [intimidation and duress], it has the burden of convincing the court that they are in fact absent." Judd v United States, supra.

The phrase, "implied coercion," referred to by appellant, was utilized by the Supreme Court in Amos v United States, 255 US 313, 65 L ed 654, 41 S Ct 266 (1921), where Government agents went to defendant's home, and, not finding him there, but finding a woman who said she was his wife, told her that they were revenue officers and had come to search the premises " 'for violation of the revenue law.' " Mr. Justice Clark, speaking for the Court, said:

[4] United States v Sellers, 12 USCMA 262, 30 CMR 262.

"The contention that the constitutional rights of defendant were waived when his wife admitted to his home the government officers, who came, without warrant, demanding admission to make search of it under government authority, cannot be entertained. . . . it is perfectly clear that, under the implied coercion here presented, no such waiver was intended or effected."

"Mere submission to the color of authority of law enforcement officers, or acquiescence in the officers' announced or indicated purpose to search, is not consent." United States v Justice, supra, page 34.

In view of the facts in this case and in consideration of the total atmosphere under which these searches were conducted, as recited above, it might reasonably be argued, as does appellant, that the "consent" of Mrs. Smith was not real, uncoerced or voluntary; that the searches were, therefore, illegal and the evidence seized inadmissible. However, assuming illegality, "Improper admission of evidence obtained as a result of an illegal search does not justify reversal of an otherwise proper conviction, if the evidence does not prejudice the accused." United States v Justice, supra, page 35; citing United States v Higgins, 6 USCMA 208, 20 CMR 24; Woods v United States, 240 F2d 37 (CA DC Cir) (1956), rehearing en banc denied. Appellant contends that "Without the shoes and boots, the balance of circumstantial evidence is visibly affected."

Both the shoes and the combat boots were subjected to laboratory analysis. Type "O" blood was found on the shoes, but nothing of significance was found on the boots. Sergeant Krupowicz had type "O" blood while the accused is type "B." However, type "O" blood was also found on the scraps of clothing accused was seen burning, on the pants he gave to the German garbage man, and he admitted having an argument and fight with the deceased in the latter's apartment shortly prior to the time of death at which time his clothes became bloodstained. This, together with other substantial evidence, albeit circumstantial, leads us to the conclusion that the admission of this evidence was not a substantial factor in accused's conviction. Kotteakos v United States, 328 US 750, 90 L ed 1557, 66 S Ct 1239 (1946); United States v Justice, and United States v Higgins, both supra.

There are other minor errors alleged by the defense which we have carefully considered and find not serious enough to warrant discussion. Finding no errors prejudicial to the substantial rights of the accused, the decision of the board of review is affirmed.

Chief Judge QUINN concurs.

FERGUSON, Judge (concurring in the result):

I concur in the result.

I disassociate myself entirely from the discussion of the staff judge advocate's participation in the early pretrial stages of the case and his preparation thereafter of the advice to the convening authority under Uniform Code of Military Justice, Article 34, 10 USC § 834. In my opinion, it was erroneous for the staff judge advocate to act as he did and thereafter to advise the convening authority on the charges. See my dissenting opinions in United States v Dodge, 13 USCMA 525, 33 CMR 57, and United States v Mallicote, 13 USCMA 374, 32 CMR 374.

Nevertheless, I join in affirming the findings and sentence as, under the peculiar circumstances of this case, the error was not prejudicial. Lieutenant Colonel Wilber's advice fairly portrayed the case to the convening authority, and there can be no argument that the evidence, the nature of the charges, and the possible punishment would have led any staff judge advocate to recommend, and any commander to order, trial by general court-martial. The post-trial review was, of course, conducted by another officer in another command.

I, therefore, agree that the decision of the board of review must be affirmed.