UNITED STATES, Appellee,

v.

Andrew MITCHELL, Jr., Aviation Boatswain's Mate (Launching and Recovery Equipment) Second Class, U.S. Navy, Appellant.

No. 93–1044.
CMR No. 92 1933.

U.S. Court of Military Appeals.

Argued Oct. 5, 1993.

Decided April 29, 1994.

For Appellant: *Lieutenant Alice B. Lustre,* JAGC, USN (argued).

For Appellee: *Colonel T.G. Hess,* USMC (argued); *Commander S.A. Stallings,* JAGC, USN, *Major Scott R. Thomas,* USMCR, *Captain Laulie S. Powell,* USMC (on brief).

*Amici Curiae* on behalf of Appellant: *Richard T. McNeil* (argued); *Joseph B. Gilbert* (on brief)—For Members Opposed to Maltreatment of Servicemembers. *Colonel Stephen D. Smith, Major Robin L. Hall, Captain Thomas D. Wight* (on brief)—For Defense Appellate Division, USA.

*Amicus Curiae* on behalf of Appellee: *Colonel Jeffery T. Infleise* and *Captain Jane M.E. Peterson* (on brief).

*Opinion of the Court*

SULLIVAN, Chief Judge:

Appellant was tried by a special court-martial composed of a military judge sitting alone at Naval Air Station, Pensacola, Florida, on June 17, 1992. In accordance with his pleas, he was found guilty of wrongful disposal of military property, theft of property of the United States, indecent assault, and using indecent language, in violation of Articles 108, 121, and 134, Uniform Code of Military Justice, 10 USC §§ 908, 921, and 934, respectively. He was sentenced to a bad-conduct discharge, forfeiture of $500 pay per month for 4 months, and reduction to pay grade E–1. The convening authority approved this sentence on August 4, 1992. The Court of Military Review affirmed the findings of guilty and the sentence in this case on May 24, 1993. 37 MJ 903 (*en banc*).

On July 13, 1993, this Court granted review of the following issue of law:

WHETHER THE JUDGE ADVOCATE GENERAL OF THE NAVY'S PREPARATION AND/OR SIGNING OF THE NAVY–MARINE CORPS COURT OF MILITARY REVIEW JUDGES' FITNESS REPORTS DEPRIVE THAT COURT OF ITS INDEPENDENCE

AND THE APPEARANCE OF INDE-PENDENCE.

A. WHETHER THE NAVY–MARINE CORPS COURT OF MILITARY REVIEW ERRED IN FINDING THAT NO APPEARANCE OF INTERFERENCE IN THE INDEPENDENCE OF THAT COURT'S JUDGES EXISTS.

B. WHETHER THE NAVY–MARINE CORPS COURT OF MILITARY REVIEW APPLIED AN INCORRECT TEST BY REQUIRING A SHOWING OF THE EXISTENCE OF *ACTUAL* PREJUDICE.

In accord with our recent unanimous opinion in *United States v. Graf*, 35 MJ 450, 464–67 (CMA 1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 917, 127 L.Ed.2d 206 (1994), we hold that the naval officer fitness-report system, in effect at the time of appellant's review before the Navy–Marine Corps Court of Military Review, did not deprive that court of its independence or its appearance of independence. *See generally Weiss v. United States,* —— U.S. ——, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994).

## FACTS

Appellant received a bad-conduct discharge as part of his adjudged sentence. After approval of this sentence by the convening authority, his court-martial case was sent to the Court of Military Review in accordance with Article 66(b)(1), UCMJ, 10 USC § 866(b)(1), on August 17, 1992. Appellate counsel was assigned and a brief filed there on December 16, 1992. In that brief she assigned the following error:

THE JUDGE ADVOCATE GENERAL OF THE NAVY'S PREPARATION OF THE NAVY–MARINE CORPS COURT OF MILITARY REVIEW JUDGES' FITNESS REPORTS DEPRIVES THE COURT OF ITS INDEPENDENCE AND THE APPEARANCE OF INDE-PENDENCE.

The parties to this appeal then moved the Court of Military Review to admit various appellate exhibits concerning the assigned issue. At no time did appellant move to disqualify any particular member of the Court of Military Review.

The Court of Military Review then issued its opinion in this case. In providing a "factual" background for resolving the assigned issue, it began with the following footnote:

The details in this background are included to provide an adequate factual record on which to decide this issue. The factual matter described above was developed at the appellate stage, pursuant to our fact-finding powers under Article 66(c), UCMJ, through a combination of discovery and disclosure as well as judicial notice of commonly known regulations and practices in the Department of the Navy. Unless otherwise indicated, the details of fitness report preparation and the identity of the participants in the process pertain to the most recent annual fitness report cycle for Navy captains and Marine Corps colonels, which ended 31 July 1992.

The text of the opinion begins:

Fitness reports are required for all commissioned officers in the Department of the Navy. This requirement is imposed by Article 1129 of Navy Regulations, which are issued pursuant to 10 USC § 6011 and have the force of law. *See Cafeteria and Restaurant Workers v. McElroy,* 367 U.S. 886, [81 S.Ct. 1743, 6 L.Ed.2d 1230] (1961). Fitness reports are submitted annually and on certain other specified occasions, such as transfer. In the Navy, the fitness report requirement is implemented by Naval Military Personnel Command Instruction (NAVMILPERSCOMINST) 1611.1A of 26 March 1990, Subj: Reports on the Fitness of Officers, and in the Marine Corps by Marine Corps Order (MCO) P1610.7 of 6 November 1985, Subj: Performance Evaluation System. The latter specifically directs that reports for Marine judges comply with instructions of the JAG in addition to the policies in the Marine Corps order itself. *Both directives stress the importance of the fitness report for promotion, retention, and assignment of the officer concerned. In addition, both entitle the officer concerned to review his report and, if he is dissatisfied with its*

*contents, to submit a statement to that effect.*

The fitness reports for Navy and Marine Corps officers serve not only to assess an officer's performance and conduct during the past reporting period, but also to identify his value to the Department of the Navy for the future. Although the primary function of these reports is to identify those officers best qualified to meet the leadership and technical needs of the Nation's sea services, another significant purpose is to inform the officer concerned of his deficiencies and areas where he can improve. Both directives require that the officer be counseled if his report is adverse in any category of evaluation. Both Navy and Marine Corps reports require evaluation in several key areas of performance, including some arguably relevant to this issue, such as loyalty (USMC), cooperation (USMC), organizational support (USN), working relations (USN), and judgment (both).

In addition, both fitness report directives identify the officer responsible for the submission of the report—the "reporting senior"—as the next officer senior to the evaluated officer in the chain of command who is specifically authorized by the controlling directives to submit the report. For this Court's judges, that officer has been the JAG. Judge Advocate General Instruction 5400.1A of 6 July 1992, Subj: Office of the Judge Advocate General (OJAG) Organization Manual, § 109. For Marine judges, there is an additional participant in the fitness report process, called the "reviewing officer," who is required to review the reporting senior's submission for consistency, accuracy, lack of bias, and adherence to Marine Corps fitness report policy. MCO P1610.7. For the three Marine judges on this Court, that officer has, in recent times, been the Assistant Commandant of the Marine Corps.

Another requirement of both fitness report directives is comparison rankings with similarly evaluated officers of the same pay grade in the same organization. All presently assigned appellate judges are in pay grade 0–6. Consequently, the five existing Navy appellate judges (excluding the Chief Judge) are ranked against each other. Because of his additional administrative duties, the Chief Judge is ranked against no other officer. Marine appellate judges are ranked against other Marine Corps colonels for whom the JAG is the reporting senior. For each of the three Marine judges currently assigned, this group includes the other two Marine judges and the Assistant Judge Advocate General for Military Justice ("AJAG").

*Recommended fitness reports for appellate judges are routinely prepared by the AJAG, or by his principal assistant, for submission to the JAG for review and signature. The JAG has the sole discretion to accept, modify, or reject the recommendations. Each judge has been afforded the opportunity to provide information and comments for incorporation into his report before its preparation.*

Because the AJAG fills a significant role in the preparation of the judges' fitness reports, an explanation of his duties is in order. He is generally responsible to the JAG for performance of the JAG's military justice duties under the UCMJ, the Manual for Courts–Martial (MCM), and Judge Advocate General Instruction 5800.7C of 3 October 1990 (JAGMAN). OJAG Organization Manual, § 107. In this capacity he supervises the Director, Criminal Law Division, and is responsible for that officer's performance of his duties. *Id.* The duties of the Director, Criminal Law Division, include drafting legal and policy advice for the JAG on military justice matters; reviewing legislative and regulatory proposals affecting military justice; reviewing all decisions of military appellate courts for systemic malfunction; staffing JAG certification of issues for appellate review; and providing timely guidance to all military justice practitioners in the Department of the Navy. *Id.* The AJAG also serves as the Officer–in–Charge, Navy–Marine Corps Appellate Review Activity (NAMA-RA). In that capacity, he is responsible to the JAG for the administrative processing of courts-martial under Articles 66, 67, 69

and 73, UCMJ. This general responsibility includes, *inter alia*, receiving cases from the field and preparing them for review by this Court and by the Court of Military Appeals; issuing mandates and orders directed by the appellate courts; and supervising appellate counsel for the appellants and the Government.

37 MJ at 905–06 (emphasis added).

## INTRODUCTION

This is the third of three recent cases in which a major facet of the military justice system has been challenged. *United States v. Weiss*, 36 MJ 224 (CMA 1992), *aff'd*, —— U.S. ——, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994) (appointment of military judges and terms of office for military judges); *see United States v. Graf*, 35 MJ 450 (CMA 1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 917, 127 L.Ed.2d 206 (1994). Today, this Court holds that Naval regulations requiring officer-fitness reports for appellate military judges do not abrogate the Fifth Amendment; Article 37, UCMJ, 10 USC § 837; or RCM 902, Manual for Courts–Martial, United States, 1984. *See generally United States v. Mabe*, 33 MJ 200 (CMA 1991).

All these cases are significant because they show that the process which Congress has devised to permit challenges to our system works. Courageous and competent military defense counsel are bringing these challenges at the trial level. The same courage and expertise has also been shown at the appellate level. In addition, this Court has not summarily denied review in these cases, using our discretionary review power. Art. 67(a)(3), UCMJ, 10 USC § 867(a)(3)(1989). Finally, the Supreme Court has recognized the importance of the Constitutional rights of servicemembers by granting certiorari in two of these cases. As Justice Ginsburg observed in her separate opinion in *Weiss*: "[M]en and women in the Armed Forces do not leave constitutional safeguards and judi-

cial protection behind when they enter military service." —— U.S. ——, 114 S.Ct. at 769.

### I

### DEFENSE CLAIM

Appellant's case was reviewed by the Navy–Marine Corps Court of Military Review in accordance with Article 66 of the Code. He asserts that the *Due Process Clause of the Fifth Amendment* requires that such a judicial review be done by a court independent in appearance, as well as in fact.[1] Relying on *Marshall v. Jerrico*, 446 U.S. 238, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980), he then argues that the Naval officer fitness-report system created a constitutionally impermissible appearance of "impropriety" concerning his appellate military judges. Accordingly, he asks that the decision of the Navy–Marine Corps Court of Military Review in his case be set aside and his case be remanded to a Court of Military Review whose military judges are not subject to this fitness-report system.

We initially note that the briefs were filed and oral argument heard in this case prior to the decision of the Supreme Court in *Weiss v. United States*, —— U.S. ——, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994). That decision held that the Due Process Clause of the Fifth Amendment was not violated because trial and appellate military judges had no fixed terms of office. *The Supreme Court specifically noted that those petitioners did "not allege that the judges in their cases were or appeared to be biased."* *Id.* at ——, 114 S.Ct. at 761. Appellant in the assigned issue avers both that his appellate military judges were not independent and that they did not appear to be independent in the review of his case. However, he makes no argument and acknowledges that there is no evidence that his appellate military judges were not actual-

---

1. The Code of Judicial Conduct of the American Bar Association (1989) provides in Canon 1 that a "JUDGE SHOULD UPHOLD THE INTEGRITY AND INDEPENDENCE OF THE JUDICIARY.

   An independent and honorable judiciary is indispensable to justice in our society...."

   Nevertheless, what is an independent judiciary is the question in dispute even in the civilian community. *See* Kaufman, *Chilling Judicial Independence*, 88 Yale L.J. 681 (1979); *cf.* Berger, *"Chilling Judicial Independence": A Scarecrow*, 64 Cornell L.Rev. 822 (1979).

ly independent in his case. Accordingly, our Constitutional inquiry is appropriately limited to *the appearance of independence of the military judges* who sat on the appellate review of this case.

We also note that appellant's "appearance-of-impropriety" claim is predicated on two related suppositions concerning the Naval officer fitness-report system. First, he asks this Court to hold as a matter of law that *a reasonable person might perceive* that the Judge Advocate General of the Navy, the signer of the appellate military judges' fitness reports, and the Assistant Judge Advocate General, the drafter of these reports, were biased for the prosecution or aligned with the Government at the time his appeal was decided. Second, he asks this Court to hold as a matter of law that *a reasonable person might further perceive that* appellate military judges generally shape their findings and sentencing decisions in hopes of acquiring favorable fitness reports. Both possible perceptions, he asserts, combine to create a constitutionally impermissible appearance that his appellate military judges shaped their decisions in his case in the Government's favor. Final Brief at 45.

## II

### REASONS FOR DENYING CONSTITUTIONAL CLAIM

#### A

##### INCORRECT CONSTITUTIONAL STANDARD

Appellant's claim in the present case is based on the Due Process Clause of the Fifth Amendment and the decision of the Supreme Court in *Marshall v. Jerrico, supra.* He asserts that the Naval officer fitness-report procedure violates the above constitutional provision because it creates "a possible temptation to the average man as judge" to engage in an unfair or biased appellate review in favor of the Government. Final Brief at 45, quoting *Marshall*, 446 U.S. at 242, 100 S.Ct. at 1613. His argument, however, ignores the fact that his Constitutional due

process claim is raised in the context of a court-martial. *See Weiss v. United States,* —— U.S. at ——, 114 S.Ct. at 760–61.

The Supreme Court has long held that the Due Process Clause basically requires a "fair trial in a fair tribunal." *In Re Murchinson,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). Moreover, the Supreme Court has also held that this Constitutional provision requires a tribunal where the "probability" of actual "unfairness" is not great. *See Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975). Thus, the appropriate question in a civilian context is whether a litigant faced a "constitutionally intolerable" risk of unfairness when his case is decided by a particular judge or judicial tribunal. *Id.; see Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for Southern California,* —— U.S. ——, ——, 113 S.Ct. 2264, 2277, 124 L.Ed.2d 539 (1993).

■ Of course, it is equally well established that a servicemember's Constitutional rights are not identical to his civilian counterpart. The Supreme Court in *Parker v. Levy,* 417 U.S. 733, 758, 94 S.Ct. 2547, 2562–63, 41 L.Ed.2d 439 (1974), commented on this Constitutional reality as follows:

> While the members of the military are not excluded from the protection granted by the First Amendment, the different character of the military community and of the military mission requires a different application of those protections. The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it. . . .

Moreover, recently in *Weiss v. United States, supra,* the Supreme Court reiterated its long-standing position that great deference be afforded to congressional determinations "relating to the rights of servicemembers." *Id.* at ——, 114 S.Ct. at 761. A similar policy of deference has been applied by the Supreme Court with respect to service regulations when they are promulgated by the military in accordance with congressional direction. *See Goldman v. Weinberger,* 475

U.S. 503, 507–08, 106 S.Ct. 1310, 1313–14, 89 L.Ed.2d 478 (1986).

■ In appellant's case, it is uncontroverted that the complained—of fitness—report evaluations were authorized by Department of the Navy regulations. Moreover, these service regulations were not new, and Congress was clearly aware of them when it amended Article 66(a), UCMJ, 10 USC § 866(a), in 1968, and created a court including appellate military judges. *See* Art. 66(g) (1968). Therefore, although a servicemember has a Constitutional right to a judicial tribunal which appears independent, *de novo* application of the civilian Constitutional standard to determine the scope of this right is not appropriate. Instead, we need only decide whether the appearance factors favoring appellate military judges without these Naval officer-fitness reports "are so extraordinarily weighty as to overcome the balance struck by Congress" and the Department of the Navy. *Weiss v. United States,* —— U.S. at ——, 114 S.Ct. at 761; *Middendorf v. Henry,* 425 U.S. 25, 44, 96 S.Ct. 1281, 1292, 47 L.Ed.2d 556 (1976). *See generally Goldman v. Weinberger,* 475 U.S. at 507–08, 106 S.Ct. at 1313–14. Appellant's Constitutional argument initially fails because he has not met his heavy burden to show the Constitutional invalidity of this facet of the military justice system. *Id.*

## B

### FIRST INVALID PREMISE

(No Reasonably Possible Perception of JAG or AJAG Prosecutorial Bias)

■ An additional reason that appellant's Constitutional claim fails is that he has not

established the legal premises supporting it. A lynchpin of appellant's due process claim against the fitness-report system is his argument that the makers of these reports for appellate military judges must be viewed as a matter of law as apparently biased in favor of the prosecution. He argues that such a legal conclusion is required because a reasonable person viewing the JAG and AJAG's duties and their performance of these duties might perceive them to be aligned with the Government. We disagree. *See generally Weiss v. United States,* —— U.S. at ——, 114 S.Ct. at 762.

### (1)

### STATUTORY DUTIES OF JAG

### REGULATORY DUTIES OF AJAG

Appellant initially asserts that the Judge Advocate General of the Navy "serves various, often contradictory, roles within the military justice commands of the Navy–Marine Corps Appellate Review Activity and the Court of Military Review." Final Brief at 21. He further asserts that "the JAG's best interests are not always aligned with the protection of the court." Final Brief at 26. Finally, he asserts that "the JAG's and AJAG's prosecutorial duties within the command structure create an unresolved conflict between the JAG's interest in furthering prosecutorial objectives and simultaneously preserving the court's independence." Final Brief at 44. In general, he cites the JAG's statutory role as the provider of legal services to Navy Commands and his statutory roles in the military justice system.[2]

---

2. A separate opinion joined by several judges in the court below noted the following statutory responsibilities of the Judge Advocate General of the Navy in general:

The Office of the Judge Advocate General of the Navy is in the executive part of the Department of the Navy. 10 USC § 5148(b). The Judge Advocate General of the Navy performs his duties under the direction of the Secretary of the Navy. 10 USC § 5148(d).

The Judge Advocate General of the Navy is assigned to the staff of the Chief of Naval Operations (CNO) as Special Assistant for Legal Services, and is tasked to advise and assist

the CNO in formulating and implementing policies and initiatives pertaining to the provision of legal services within the Navy. JAGINST 5400.1A, § 102.b. Additionally, the JAG exercises, for CNO, centralized coordination of the provision of legal services by the Naval Legal Service Command and other judge advocates; effects liaison with the Commandant of the Marine Corps concerning legal service matters of mutual interest to the Navy and Marine Corps; and maintains liaison, for the CNO, with other DoD components, other government agencies, and agencies outside the Gov-

Again, we must note that appellant's appeal was still pending when the Supreme Court handed down its decision in *Weiss v. United States, supra.* There the Supreme Court commented on the relationship of the Judge Advocate General with military judges as follows:

> Article 26 places military judges under the authority of the appropriate Judge Advocate General rather than under the authority of the convening officer. 10 USC § 826. Rather than exacerbating the alleged problems relating to judicial independence, as petitioners suggest, we believe this structure helps protect that independence. Like all military officers, Congress made military judges accountable to a superior officer for the performance of their duties. *By placing judges under the control of Judge Advocates General, who have no interest in the outcome of a particular court-martial, we believe Congress has achieved an acceptable balance between independence and accountability.*

—— U.S. at ——, 114 S.Ct. at 762 (emphasis added).

This view of the protective role of the Judge Advocate General with respect to judges in the military justice system is not new. In *United States v. Mabe*, 33 MJ at 205–06, this Court noted the Judge Advocate General of the Navy's express recognition of this important responsibility and his actions in that case exercising that responsibility. Accordingly, we cannot presume for the pur-

pose of appellant's argument that the Judge Advocate General holds a prosecutorial office or that the duties of his position reasonably imply a bias in favor of the Government. *Weiss v. United States, supra.*

Turning to the Assistant Judge Advocate General for Military Law, we note that his duties are not statutory, but are regulatory. *See supra* at 134. We have evaluated those duties and conclude that he, like the Judge Advocate General of the Navy, is also neither a prosecutor nor aligned with the Government as a result of his duties.

Accordingly, we conclude that appellant's systemic due process claim also fails to the extent it rests on a misapprehension of the lawful role of these military officers in the military justice system. 114 S.Ct. at 762 (Judge Advocates General "have no interest in the outcome of a particular court-martial."). *Cf. In Re Murchinson*, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955) (judge as one-man grand jury); *Kendrick v. Carlson*, 995 F.2d 1440, 1444 (8th Cir.1993) (United States Attorney is counsel for Government in all cases brought in district while in office).

### (2)

### PERFORMANCE OF JAG AND AJAG DUTIES

Appellant's assertion of a reasonably possible perception of prosecutorial bias on the part of the Judge Advocate General of the Navy and the Assistant Judge Advocate General for Military Law is not based exclusively

---

ernment on legal service matters affecting the Navy. JAGINST 5400.1A, § 102.b.
37 MJ at 922–23 (Reed, J., concurring in the result).
Chief Judge Larson also summarized the Judge Advocate General's particular responsibilities under the Uniform Code of Military Justice:

> The UCMJ authorizes the JAG to perform a variety of functions, which in sum total describe his role in the military justice system as a crucial one. Specifically, under Article 6, assignments of all judge advocates in the Navy, including trial and appellate judges, are made upon his recommendation. Article 6(b) also establishes the right of any staff judge advocate in the field to communicate directly with the JAG. Under Articles 26 and 27, military judges and trial and defense counsel must be certified by him before they can practice in courts-martial, authority that necessarily im-

plies the concomitant authority to decertify. Noted earlier was his mandate to establish this Court and appoint its judges under Article 66. Article 67 grants him the authority to refer issues of law to the Court of Military Appeals, as does Article 69 with respect to the Court of Military Review. Article 69 also assigns the JAG the responsibility to determine legal and factual errors in all courts-martial which are not subject to review under Article 66. Finally, the JAG is authorized to grant a new trial under Article 73. Furthermore, under departmental regulations, the JAG acts for the Secretary of the Navy in the exercise of many of the latter's powers under the UCMJ. For example, in the name of the Secretary, he grants convening authority status to various commanders pursuant to Article 22(a)(6). JAGMAN § 0115.
37 MJ at 909.

on the former's statutory duties or the latter's regulatory duties. In his brief, appellate defense counsel cited examples of both officers' exercise of their military responsibilities over the years which might reasonably imply prosecutorial bias. It states:

Third, Judge Rubens' well known perception [3] that his fitness reports and promotion opportunities were adversely affected by his participation in high profile decisions of the court creates an appearance of impropriety. Fourth, the JAG's skewed pattern of certifying issues to this Court to further prosecutorial interests rather than impartially guarantee this Court's review of vital legal issues as required by his judicial certification powers creates an appearance of impropriety. And, finally, the AJAG's collusion with the Government in obstructive tactics and claims of attorney-client relationship create the appearance of prosecutorial bias. . . .

Final Brief at 44 (emphasis added).

We first note that the record before us does establish that Judge Reubens perceived his professional military career was adversely affected by an Assistant Judge Advocate General as a result of his decisions as an appellate military judge. Judge Reubens, however, did not sit on appellant's case nor was his putative nemesis, Colonel Mitchell, the Assistant Judge Advocate General of the Navy at the time of the appellate review of appellant's case. Moreover, the judge's claims are now disputed by the Assistant Judge Advocate General. In any event, no evidence was presented that this matter was ever submitted to the Judge Advocate General of the Navy for action prior to the challenged review of appellant's case. Cf. United States v. Mabe, 33 MJ at 206.

We next note that concern about the certification practice of the Judge Advocate General of the Navy was called to our attention most recently in United States v. Schoof, 37 MJ 96 (CMA 1993). In that case, we held that appellant who actually received appellate review before our Court had no standing to complain about this practice for purposes

of an equal protection of law argument. Id. at 100. We had no occasion to decide in that case whether this practice, in its present statutory framework generally favoring defense appeals, established as a matter of law a prosecutorial bias on the part of the Judge Advocate General of the Navy.

In United States v. Monett, 16 USCMA 179, 180 n. 1, 36 CMR 335, 336 n. 1 (1966), this Court commented on the role of the Judge Advocate General in the certification process, as follows:

The Uniform Code of Military Justice confers upon The Judge Advocate General independent judicial or quasi-judicial responsibilities which are so substantially separated from the mainstream of prosecution that it is at least arguable that his office stands entirely apart from either party to the case. See Articles 61, 66(f), and 69, Code, supra, 10 USC §§ 861, 866, and 869, respectively. The Uniform Code provides that the United States shall be represented by trial counsel at the trial level and by appellate Government counsel at the appellate level. Articles 38 and 70(b), Code, supra, §§ 838 and 870, respectively. Considering these factors, The Judge Advocate General's authority to certify issues of law for review by this Court is not unlike the authority of the Courts of Appeals to certify issues to the United States Supreme Court. It is also apparent from our records that, in certifying issues, The Judge Advocate General has acted not only in cases in which the decision of the board of review has been favorable to the accused, but also when the decision has been adverse to him.

We finally note that appellant in his brief asserts that appellate government counsel asserted an attorney-client relationship with the JAG in this case. He states:

During proceedings before the Court of Military Review, the Appellate Government Division asserted a claim of attorney work-product with regard to a memorandum forwarding its request for certification to the JAG. Government Response to

---

3. See 37 MJ at 913–14 for a discussion of former Judge Ruben's affidavit.

Appellant's Motion to take Depositions. This claim was asserted again at oral argument, and although the documents were ultimately produced, it was done through a "waiver" of the asserted privilege. Government Motion to Respond to Questions Raised by Court at Oral Argument. While "work-product" includes notes and memorandum created by an attorney or his agent in anticipation of litigation, that privilege applies only to materials that are used by and for the attorney or his agent. *United States v. Vanderwier*, 25 MJ 263 (CMA 1987).

Final Brief at 41.

■ We are not persuaded that the record before us establishes a reasonably possible perception that the Judge Advocate General of the Navy or his Assistant for Military Law is biased in favor of the prosecution. *See also Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988). One unrelated personnel controversy, one raw statistical study, and one questionable tactical decision by counsel during this very case do not provide a reasonable basis for calling into question the impartiality of the above-named military officers. *See generally United States v. Cooley*, 1 F.3d 985, 993–94 (10th Cir.1993). *See also McCleskey v. Kemp*, 481 U.S. 279, 292–97, 107 S.Ct. 1756, 1766–70, 95 L.Ed.2d 262 (1987). In any event, as noted above, even if such a reasonably possible perception may lie on this basis, appellant's particular Constitutional claim as averred, requires more.

### C

### SECOND INVALID PREMISE

(No Reasonably Possible Perception That Appellate Judges Shape Their Opinions Because of Fitness Reports)

■ Appellant's second supposition supporting his due process claim is that a rea-
sonable person or observer might perceive that appellate military judges generally shape their judgments to secure better fitness reports from the JAG or AJAG.[4] Such an argument implies that the appellate decisions of these military judges can be reasonably viewed as an appropriate subject for a Naval officer fitness report. We reject both contentions as a matter of law. *United States v. Graf* and *United States v. Mabe*, both *supra* at 135.

The above argument is simply not justified in view of the realities of our present military justice system. Three reasons support our conclusion. *First*, the challenged decision of the Court of Military Review in this case was handed down in May of 1993. Its judicial action occurred long after our decisions in *United States v. Mabe*, 33 MJ 200 (1991), and *United States v. Graf*, 35 MJ 450 (1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 917, 127 L.Ed.2d 206 (1994), which expressly prohibit the Judge Advocate General or his designee's use of fitness reports to control the findings-and-sentencing decisions of military judges. *Second*, not a shred of evidence has been presented to this Court that the Judge Advocate General or his Assistant for Military Law have disregarded these decisions with respect to the fitness reports on the appellate military judges involved in this case. *See also United States Navy–Marine Corps Court of Military Review (hereafter NMCMR) v. Carlucci*, 26 MJ 328, 336 (CMA 1988) (military judges subject to ABA Code of Judicial Conduct). *Third*, review of the opinions of the Court of Military Review judges in this case reveal that none of those judges actually believed that their fitness reports could be used to evaluate their findings-and-sentencing decisions. *Cf. United States v. Deain*, 5 USCMA 44, 53, 17 CMR 44, 53 (1954). Thus, accepting, arguendo,

---

4. Judge Reed, in his opinion below concurring in the result, summarized these interests as follows:

   Some may argue that the only impact that a fitness report has on a judge is whether a judge makes flag or general officer rank. More is at stake than that. Junior judges hope for a coveted follow-on tour; 0–5's hope to make 0–6 (although there are no 0–5's on this Court today there have been in the past and the Army routinely assigns 0–5's to its Court); 0–6's hope to avoid involuntary selective early retirement if they are not ready to retire; Marine 0–6's may seek the AJAG (Military Justice) billet which in the recent past has allowed an 0–6 to retire as an 0–7; etc.
   37 MJ at 930 n. 21.

existence of the possibility of a reasonable perception of prosecutorial bias on the part of JAG or AJAG, we unequivocally conclude that it is not reasonable to further perceive that fitness reports of appellate military judges can be used to evaluate their judicial decisions.

## D

## INADEQUATE CIVILIAN CONSTITUTIONAL CLAIM

■ Appellant broadly asserts that the Naval officer fitness-report system creates a constitutionally unacceptable appearance of impropriety with respect to the appellate review of his case by military judges. Even if we applied the civilian Constitutional standard for determining an unfair tribunal to this claim, we would find it to be without merit. He has simply not persuaded us that *his reasonable man perceptions* concerning the Naval officer fitness-report system created a constitutionally impermissible risk that his case was decided unfairly by his appellate military judges. *See generally Aetna Life Insurance Co. v. Lavoie*, 475 U.S. 813, 820–25, 106 S.Ct. 1580, 1584–87, 89 L.Ed.2d 823 (1986) (defining constitutionally impermissible risk of unfairness to parties). *Cf. Liljeberg v. Health Service Acquisition Corp.*, 486 U.S. at 858–62, 108 S.Ct. at 2201–04 (defining statutorily impermissible risk of injustice to the parties).

The Supreme Court has provided general guidance in determining when the appearance of unfairness in a civilian tribunal is too great to be "constitutionally tolerable." Justice White, speaking for the Court in *Withrow v. Larkin*, 421 U.S. at 47, 95 S.Ct. at 1464, stated:

> In pursuit of this end, *various situations* have been identified in *which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.* Among these cases are *those in which the adjudicator has a pecuniary interest in the outcome* and in which he has been the target of personal abuse or criticism from the party before him.

(Emphasis added; footnote omitted.)

Recently, the Supreme Court more particularly delineated the required approach as follows:

> Appellant also presses a claim that Justice Embry had a more direct stake in the outcome of this case. In *Tumey* [*v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) ], while recognizing that the Constitution does not reach every issue of judicial qualification, the Court concluded that "it certainly violates the Fourteenth Amendment ... to subject [a person's] liberty or property to the judgment of a court the judge of which has a *direct, personal, substantial, pecuniary interest* in reaching a conclusion against him in his case." 273 U.S. at 523, 47 S.Ct., at 441.
>
> More than 30 years ago Justice Black, speaking for the Court, reached a similar conclusion and recognized that under the Due Process Clause no judge "can be a judge in his own case [or be] permitted to try cases where he has an interest in the outcome." *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). He went on to acknowledge that what degree or kind of interest is sufficient to disqualify a judge from sitting "cannot be defined with precision." *Ibid.* Nonetheless, a reasonable formulation of the issue is whether the
>
> "*situation is one 'which would offer a possible temptation to the average ... judge to ... lead him not to hold the balance nice, clear and true.*'" *Ward v. Village of Monroeville*, [409 U.S. 57] at 60, 93 S.Ct. [80] at 83 [34 L.Ed.2d 267].

*Aetna Life Insurance Co. v. Lavoie*, 475 U.S. at 821–22, 106 S.Ct. at 1585–86 (emphasis added).

■ Appellant's Constitutional argument does not satisfy this approach for two reasons. First, he has framed his appearance-of-impropriety argument concerning the fitness-report system largely in terms of the views of a reasonable person ("average man as judge,"—Final Brief at 45). Yet, the Supreme Court has made it clear that a Consti-

tutional appearance-of-fairness question is to be decided from the perspective of "a reasonable judge." *Id.* *See also United States v. Couch,* 896 F.2d 78, 82 (5th Cir.1990). Second, he has based his appearance-of-impropriety argument on a showing of a reasonable possibility of a perceived pecuniary interest of his judges in deciding his case unfairly. The Supreme Court, however, has made it clear that a showing of a "direct" pecuniary interest in deciding the case unfairly is required to establish a Due Process Clause appearance-of-unfairness violation. *E.g., Ward v. Village of Monroeville,* 409 U.S. at 60, 93 S.Ct. at 83; *Tumey v. Ohio,* 273 U.S. at 523, 47 S.Ct. at 441. The contingent convoluted argument posited by appellant is simply too speculative and remote to violate the Constitutional norm. *Aetna Life Insurance Co. v. Lavoie,* 475 U.S. at 826, 106 S.Ct. at 1588, citing *Marshall v. Jerrico, Inc.,* 446 U.S. at 243, 100 S.Ct. at 1613–14.

### III

### IMPLIED DEFENSE CLAIM

■ Appellant's reasonable-person arguments, however, do suggest an additional question for review, namely: Whether the judges of the Navy–Marine Corps Court of Military Review should have recused themselves *sua sponte* from sitting in this case under RCM 902(a). That presidential regulation provides: "*In* general. Except as provided in subsection (e) of this rule [entitled *waiver* ], a military judge shall disqualify himself or herself in any proceeding in which that military judge's impartiality *might reasonably be questioned.* " (Emphasis added.) We further note that subparagraph (c)(1) of this same rule broadly defines "Proceeding" to "include[ ] pretrial, trial, posttrial, *appellate review,* or other stages of litigation." (Emphasis added.) Accordingly, if appellant's military judges actually believed that a reasonable person might perceive them as not being independent, they were required as a matter of regulatory law to disqualify themselves from participating in the review of this case. *Id. Cf.* 28 USC § 455. *Liljeberg v. Health Service Acquisition Corp., supra; See generally* Note, *Disqualification*

*of Judges and Justices in the Federal Courts,* 86 Harv.L.Rev. 736, 745–50 (1973).

In this regard, we note the following comments from the majority opinion in *United States v. Mitchell,* 37 MJ 903, 916–17 (1993), by the court below:

Our inquiry into the appearance aspect of this assigned error does not stop with an assessment of the JAG's role in the fitness report process. Arguably, the method by which the JAG uses his staff to prepare fitness reports for his signature is solely within his discretion. Yet, if evidence suggests that fitness reports are actually prepared for the JAG's signature by an officer whose interests may be contrary to decisions that favor the appellant, we must look behind the veil to see if that process offends the appellant's right to an independent court. *See United States v. Hilow,* 32 MJ 439 (CMA 1991) (court must examine process by which convening authority detailed members to court-martial to ensure compliance with Article 25, UCMJ.)

[F]itness reports for appellate judges are prepared in the office of the AJAG. Within the Office of the JAG, this officer "stands in the shoes" of the JAG for military justice matters and, therefore, is duty-bound to ensure that military justice is administered fairly and independently. Presumably, he shares the same interest as the JAG in preserving the Court's independence.

At the same time, the AJAG is responsible, through the Director, Criminal Law Division, for implementing this Court's decisions in the field. Some of those decisions may disapprove service-wide policy previously approved by the AJAG and some could lead to significant change in the way that the military justice system operates in the Navy and Marine Corps. *See, e.g., United States v. Holloway,* 36 MJ 1078 (NMCMR 1993) (holding that the Navy's military magistrate program does not comply with *County of Riverside v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 [1991] ). In addition, we attach meaning to the fact that, organiza-

tionally, the appellate judges fall directly under the JAG and, unlike those assigned military justice duties in the Office of the JAG, judges are not subject to the control of the AJAG. OJAG Organization Manual § 107. *For these reasons, although we find nothing actually inimical to our independence in this arrangement, arguably a reasonable observer may conclude that it is inappropriate for an officer whose duties do not include supervising the Court's judges, but whose professional responsibilities are so directly and closely affected by the Court's decisions, to participate in the evaluation of the appellate judges.* [14]

---

[14]. This opinion is not the place to develop administrative measures to cure an appearance problem arising from the fitness report preparation process. *Suffice it to say that we acknowledge that such an appearance may exist,* and we urge the Judge Advocate General to examine the process with a view to ensuring that those who participate in it occupy positions less directly affected by the decisions of this Court. In addition, we share Judge Reed's belief, in his concurring opinion, that defining specific criteria for the evaluation of military judges would remove some of the mystery and uncertainty about the process and would lessen the possibility that a judge will leave this Court believing that he has paid a high professional price for his judicial decisions.

We also invite the JAG's attention to two other aspects of the process that may contribute to an unhealthy appearance: (1) The AJAG is included with the Court's Marine judges for comparison rankings, yet he is the officer who submits recommendations for their reports, and (2) the reviewing officer for Marine judge fitness reports is the Assistant Commandant of the Marine Corps. In our opinion, the latter feature is not consistent with the concept of judicial independ-

5. Judge Reed also noted other ways that the Judge Advocate General might affect an appellate judge's career, as follows:

A Judge Advocate General has sat on a Commander to Captain promotion board; has sat on boards convened to select Navy JAG Corps officers for involuntary early retirement; has sat on boards convened to recommend to the Secretary of the Navy the appointment of a Marine Corps officer to serve as the Director, Judge Advocate Division, a general officer (0–7) billet and the senior lawyer in the U.S. Marine Corps; has sat on a promotion board to recommend to the Secretary of the Navy that a Marine Corps judge advocate be as-

dence and the inherent conflict in the first aspect tends to detract from the integrity of the fitness report process as a whole.

(Most emphasis added.)

■ The standard for deciding the Manual judicial-disqualification question is the same as that provided in the Federal judicial-disqualification statute (§ 455) upon which it is based. *Id. Cf. Liteky v. United States,* — U.S. ——, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). *See* Manual, *supra* at A21–45. *See generally Liljeberg v. Health Service Acquisition Corp., supra.* The test is whether a reasonable person *who knew all the facts* might question these appellate military judges' impartiality. *See United States v. Kincheloe,* 14 MJ 40, 50 (CMA 1982); *United States v. Couch,* 896 F.2d at 82. *See also Bradshaw v. McCotter,* 785 F.2d 1327 (5th Cir.1986), *modified in part,* 796 F.2d 100 (5th Cir.1986). Moreover, this Court, in addressing similar appearance questions, has repeatedly recognized that we cannot close our eyes to "everyday, even necessary circumstance[s] in the life of Judge Advocate General Corps Officers." [5] *See United States v. Hurt,* 9 USCMA 735, 754, 27 CMR 3, 22 (1958). *See also Weiss v. United States,* — U.S. at ——, 114 S.Ct. at 760, *citing Middendorf v. Henry,* 425 U.S. at 43, 96 S.Ct. at 1291.

## IV

## REASONS FOR DENYING MANUAL CLAIM

■ In considering the import of the

signed as the Assistant Judge Advocate General of the Navy (Military Justice) and be eligible to retire as a general officer, with the rank, grade, and pay of such pursuant to 10 USC § 5149(c); has detailed Navy judge advocates to sit as the Assistant Judge Advocate General eligible to retire as a flag officer pursuant to 10 USC § 5149(c); and details judge advocates to this Court, upon recommendation of a screening board, and upon termination of such assignments, approves the reassignment of Navy judges to other billets within the Judge Advocate General's Corps, unless such judge retires. 37 MJ at 923 (footnotes omitted).

Court of Military Review Judges' comments[6] for purposes of RCM 902(a), we initially note that they fall far short of the required finding for disqualification. The judges below only acknowledged that a reasonable argument could be made that the administration of the fitness-report system in and of itself is "inappropriate." They did not find, however, that a reasonable person *knowing all the facts and circumstances* about that system could question their impartiality or independence in reviewing appellant's case. In addition, for the salient reasons stated in *United States v. Graf, supra,* we hold that a reasonable person could not question the impartiality of the appellate military judges in this case.[7]

The first fact or circumstance of which a reasonable observer would be aware is that he is assessing the impact or possible impact of this fitness-report system on a *military* judge. *See* Art. 26(c), UCMJ, 10 USC § 826(c). The latter is a military officer who has sworn to do his duty under law, *see* 5 USC § 3331, and has taken an oath to dispense justice "impartially," *see* Art. 42(a), UCMJ, 10 USC § 842(a); RCM 807(b)(2), Discussion. *See also United States v. Hubbard,* 20 USCMA 482, 43 CMR 322 (1971) (defense counsel not disqualified because fitness-report endorser was trial counsel). *Cf. United States v. Deain,* 5 USCMA 44, 52–53, 17 CMR 44, 52–53 (1954) (permanent members of court-martial panel disqualified because president of panel prepared fitness reports on that duty). Surrender to such a temptation would not only constitute a judicial ethical violation but it could also expose these military officers to criminal liability under the Uniform Code of Military Justice. Arts. 92(1) and 133, UCMJ, 10 USC §§ 892(1) and 933, respectively. *See United States v. Graf,* 35 MJ at 463; *NMCMR v. Carlucci,* 26 MJ at 336.

The second fact or circumstance that a reasonable observer would be aware of is

---

6. The judges of the Court of Military Review are not parties in this court-martial case. However, two of the judges below also attempted "to set the record straight" (37 MJ at 917 and 918) by responding in their separate concurring opinions to certain factual representations made in post-trial affidavits submitted by the parties. *But see* RCM 902(b)(3), Manual for Courts–Martial, United States (1984). *See* J. Shamen, S. Lubet, and J. Alfini, *Judicial Conduct and Ethics* § 5.13 at 121 (1990) (Disqualification of "Judge ... as a Witness"). On the contrary RCM 902(d)(2) provides: "Each party shall be permitted to question the military judge and to present evidence regarding a possible ground for disqualification before the military judge decides the matter."

We note that appellate defense counsel made no motion before, during, or after the Court of Military Review's decision was issued in this case to disqualify these judges. *See* RCM 902(d)(1). Moreover, when questioned during oral argument on this matter, appellate defense counsel indicated no concern for this irregular procedure. *See* RCM 801(g). *Cf.* RCM 902(e). Finally, we have closely examined these concurring opinions and disregarded any comments by these judges which might be considered testimony in this case. Art. 59(a), UCMJ, 10 USC § 859(a).

7. A trial judge or an appellate military judge must apply this standard in determining whether he should disqualify himself on request of a party or on his own motion. RCM 902(a). *See generally Liteky v. United States,* —— U.S. ——, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). In reviewing their decisions on these questions, appellate courts normally employ an abuse-of-discretion standard. *See generally* S. Childress and M. Davis, *Federal Standards of Review* § 12:05 at 12–35: Judicial Disqualification (2d ed. 1992). However, the appellate standard for determining an abuse of discretion by a trial judge may vary in the different United States Courts of Appeals. (1) *In Re United States,* 666 F.2d 690, 695 (1st Cir.1981) (no reasonable person could likewise conclude). (2) *United States v. Kelly,* 888 F.2d 732, 745 (11th Cir.1989); *Hewlett Packard Co. v. Bausch & Lomb, Inc.,* 882 F.2d 1556, 1567 (Fed. Cir.1989) (clear error of judgment), *cert. denied,* 493 U.S. 1076, 110 S.Ct. 1125, 107 L.Ed.2d 1031 (1990). (3) *United States v. Diaz,* 797 F.2d 99,- 100 (2d Cir.1986); *Chitimacha Tribe of Louisiana v. Harry L. Laws Co. Inc.,* 690 F.2d 1157, 1161 (5th Cir.1982), *cert. denied,* 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983); *United States v. Story,* 716 F.2d 1088, 1091 (6th Cir.1983) [no reasonable basis in record of trial]. (4) *Johnston v. Trueblood,* 629 F.2d 287, 290 (3d Cir.1980), *cert. denied,* 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981); *United States v. Carmichael,* 726 F.2d 158, 161 (4th Cir.1984); *In Re Hale,* 980 F.2d 1176, 1178 (8th Cir.1992); *Yagman v. Republic Insurance, Inc.,* 987 F.2d 622, 626 (9th Cir.1993) [no definition of abuse of discretion]. (5) *See also United States v. Balistrieri,* 779 F.2d 1191, 1204–05 (7th Cir.1985), *cert. denied,* 475 U.S. 1095, 106 S.Ct. 1490, 89 L.Ed.2d 892 (1986). To avoid any issue in this regard, we decide this question, *"de novo"* in the present case. *See United States v. Graf,* 35 MJ 450, 465–66 (CMA 1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 917, 127 L.Ed.2d 206 (Jan. 24, 1994).

that the fitness report, no matter who it was prepared by or signed by, could not consider the judge's findings or sentencing decisions. *United States v. Graf,* 35 MJ at 465; *United States v. Mabe, supra; see Weiss v. United States,* —— U.S. at —— n. 7, 114 S.Ct. at 763 n. 7; *see also United States v. Martinez,* 11 USCMA 224, 29 CMR 40 (1960). In the absence of some evidence to the contrary, we must presume not only that the Judge Advocate General and his assistant know the law but also that they follow it. *E.g., United States v. Mabe,* 33 MJ at 206. *See generally Withrow v. Larkin,* 421 U.S. at 47, 95 S.Ct. at 1464 ("presumption of honesty and integrity in those serving as" administrative investigators and "adjudicators"). Accordingly, even if prosecutorial bias actually existed on the part of the JAG or AJAG, there is no reason to expect it might be exercised through the fitness-report system.

The third fact or circumstance known to the reasonable observer is that the appellate military judge has viable remedies to protect himself from untoward influence of the Judge Advocate General or his subordinate. *United States v. Graf, supra* at 463. None of the appellate military judges availed himself or attempted to avail himself of these remedies with respect to appellant's case or with respect to the performance of his judicial duties while that case was pending. *Cf. NMCMR v. Carlucci, supra.* Moreover, no Court of Military Review judge actually disqualified himself in this case.

The fourth fact or circumstance that a reasonable person would know about the appellate review of this case is that no Court of Military Review judge has asserted a belief that the JAG or AJAG was generally biased for the prosecution. *See United States v. Graf, supra* at 463. Moreover, appellate defense counsel, while maintaining a systemic challenge to the Court of Military Review, proffers no particular reason why his appellate military judges might be otherwise biased for the prosecution in his case. *See United States v. Allen,* 33 MJ 209 (CMA

1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1473, 117 L.Ed.2d 617 (1992). The absence of such proof severely undermines appellant's argument that a reasonable person might question the impartiality of his judges at the Court of Military Review. *United States v. Kincheloe,* 14 MJ 40, 51 (CMA 1982).[8]

V

## CONCLUSION

Our particular concern in this case is whether *appellant* received a fair and impartial review of his court-martial by members of the Navy–Marine Corps Court of Military Review. Art. 66 of the Code. He is clearly entitled to such a review, independent both in fact and appearance, both as a matter of constitutional and military due process. *See Aetna Life Insurance Co. v. Lavoie* and *United States v. Kincheloe,* both *supra;* and RCM 902. Yet it is obvious to us that *the judges of the Navy–Marine Corps Court of Military Review,* at least those participating in appellant's case, are concerned about the fairness of their treatment as professional military officers. We sense dissatisfaction in the Navy appellate judges with respect to their officer-fitness-report system. *See generally Noyd v. Bond,* 395 U.S. 683, 695, 89 S.Ct. 1876, 1883, 23 L.Ed.2d 631 (1969).

Nevertheless, our recognition of their complaints does not authorize this Court to employ our appellate powers to create, revamp, or eliminate the military-officer-fitness-report system. We say again what we said in *United States v. Mabe,* 33 MJ at 206 n. 6:

The two minority judges below misconstrue the purpose of appellate review in the military justice system. It is not a vehicle to protect the professional reputation of military attorneys involved in command-influence cases. Moreover, it is not designed to implement or facilitate the routine bureaucratic functioning of the officer's fitness report system. *These are responsibilities of the Judge Advocate Gen-*

8. Our judgment might be different if the judges of the Court of Military Review were reviewing a case where the Judge Advocate General or the Assistant Judge Advocate General, prior to their appointment, acted as a military trial judge, trial counsel, defense counsel, or staff judge advocate in that case. *See generally United States v. Engle,* 1 MJ 387, 390 (CMA 1976).

*eral of the Navy.* Art. 26(c), Uniform Code of Military Justice, 10 USC § 826(c). Our duty is to insure that servicemembers receive a fair court-martial in accordance with law. Art. 67, UCMJ, 10 USC § 867. (Emphasis added).[9]

Of course, there is another forum in which consideration of these concerns is especially appropriate, *i.e.,* Congress. After all, it is specifically authorized to "make Rules for the Government and Regulation of the land and naval Forces." U.S. Const. art. I, § 8, cl. 14. Moreover, in the past it has considered and remedied *some of the very problems* now raised with respect to fitness reports of appellate military judges. For example, Article 66(g) states:

> (g) No member of a Court of Military Review shall be required, or on his own initiative be permitted, to prepare, approve, disapprove, review, or submit, with respect to any other member of the same or another Court of Military Review, *an effectiveness, fitness, or efficiency report, or any other report or document used in whole or in part for the purpose of determining whether a member of the armed forces is qualified to be advanced in grade, or in determining the assignment or transfer of a member of the armed forces, or in determining whether a member of the armed forces should be retained on active duty.*

(Emphasis added.)

Finally, the President acting pursuant to Article 6a, UCMJ, 10 USC § 806a (1989), might also consider these concerns. Article 6a provides:

**§ 806a. Art. 6a. Investigation and disposition of matters pertaining to the fitness of military judges**

(a) The President shall prescribe procedures for the investigation and disposition of charges, allegations, or information pertaining to the fitness of a military judge or military appellate judge to perform the duties of the judge's position. To the ex-

tent practicable, the procedures shall be uniform for all armed forces.

(b) The President shall transmit a copy of the procedures prescribed pursuant to this section to the Committees on Armed Services of the Senate and the House of Representatives.

Thus, once again, this Court must respectfully decline to legislate by litigation. *See United States v. Graf,* 35 MJ 450 (CMA 1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 917, 127 L.Ed.2d 206 (1994).

A Federal appeals court such as ours must know the extent of its power. A court in its role of providing justice may use relevant legislation to decide a case but must refrain from making it in the first place—that is for the legislative branch to do. In this case, the relief desired *by the Navy appellate military judges* must come by way of legislation from Congress or by way of executive regulation from the President.

The decision of the United States Navy–Marine Corps Court of Military Review is affirmed.

Judge CRAWFORD concurs.

GIERKE, Judge (concurring):

I agree with Chief Judge Sullivan's resolution of the granted issue. I write separately only to elaborate on my reasons for joining the principal opinion.

I agree that the Judge Advocate General's record on certified issues does not reflect prosecutorial bias. Government counsel do not have the opportunity afforded to an appellant to petition this Court for relief from an adverse decision of the Court of Military Review. Therefore, the only opportunity for government counsel to obtain relief from an adverse decision is to request the Judge Advocate General to certify the issue. If the number of "defense" issues were anywhere near the number of "prosecution" issues certified, I would suspect that something was seriously wrong. There should be very few "defense" issues certified if appellate defense

---

**9.** We have been informed by the parties to this appeal that the Judge Advocate General of the Navy is considering proposed changes to this

system, and we await the publication of these changes.

counsel are raising the right issues and this Court is granting review of the right cases. In short, the rarity of certified "defense" issues should be the norm if the system is working properly.

Finally, I do not believe that the Judge Advocate General was transformed into a prosecutor merely because government counsel claimed a work-product privilege for documents unrelated to appellant's case. Government counsel were wrong. Their client is the United States, not the Judge Advocate General.

COX, Judge (dubitante):

I have no quibble with the facts, law, and excellent reasoning set forth in the principal opinion. I simply question whether Congress intended for the United States Court of Military Appeals to sit in abstract philosophical judgment of the structure of the military departments, especially in a case where an appellant has pleaded guilty to the charges against him and has alleged no error in his special court-martial proceedings. Given our recent willingness to entertain such systemic attacks, however, I feel certain that we will be called upon to examine many more variations on this stock theme of *Military Justice is to Justice as Military Music is to Music* by Robert Sherrill, published in 1970. I would leave questions of how the military should be organized and administered to the Executive and Legislative branches of Government, as envisioned by the Constitution.

Furthermore, in light of the following statement in *Weiss v. United States,* —— U.S. ——, ——, 114 S.Ct. 752, 762, 127 L.Ed.2d 1 (1994), I question whether appellant's petition was providently granted:

1. Except to the extent that, on limited occasion, the text of my opinion is in conflict with Parts I and II of the majority, I concur in those Parts that dispose of appellant's constitutional argument. In that connection, I agree that our general approach in *United States v. Graf,* 35 MJ 450 (CMA 1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 917, 127 L.Ed.2d 206 (Jan. 24, 1994), controls. I dissent, however, from sections III and IV—sections that are not fairly based on our resolution of the constitutional due process issue in

Article 26 [,Uniform Code of Military Justice,] places military judges under the authority of the appropriate Judge Advocate General rather than under the authority of the convening officer. 10 U.S.C. § 826. Rather than exacerbating the alleged problems relating to judicial independence, as petitioners suggest, we believe this structure helps protect that independence. Like all military officers, Congress made military judges accountable to a superior officer for the performance of their duties. By placing judges under the control of Judge Advocates General, who have no interest in the outcome of a particular court-martial, we believe Congress has achieved an acceptable balance between independence and accountability.

*See also United States v. Graf,* 35 MJ 450 (CMA 1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 917, 127 L.Ed.2d 206 (1994).

Having said all that, I personally, like my sister and brothers, doubt the services' wisdom in leaving themselves open to the inevitable charge that judges are retained in service, promoted in grade, and given future assignments, at least in part, on the basis of some higher-up's approval of their performance as a judge. The irony is that the essence of good politics and government requires that civilian jurists be selected (elected/appointed), promoted, and given increased responsibilities and assignments on the basis of perceived merit. In the eyes of some, obviously, the military must be barred from attempting same.

WISS, Judge (concurring in part, dissenting in part, and concurring in the result): [1]

The majority purports to limit to the facts of this case its consideration whether a rea-

*Graf.* As to section V, of course I agree with the expressions of concern there. I pointedly do not agree, however, that these concerns are not a proper subject of this Court's consideration and, if need be, remedy. Appellant has argued that the flaws that I believe exist in the fitness-report system would lead a reasonable person to question the impartiality of the appellate judges who reviewed his case. Whether the fitness-report system is good or could be better, of course, is not our concern; it surely is our concern, though, whether it creates the fatal appearance

sonable person might question the impartiality of appellate military judges who function under the Navy's officer evaluation system. In doing so, however, the majority takes giant strides in reaching conclusions that largely absolve these judges in a systemic manner. Then, finding nothing idiosyncratic about this case that is legally alarming, *but cf.* 39 MJ at 145 n. 8, the majority gives its blessing to the decision of the Court of Military Review—but ends with reflections that not-so-subtly imply that the professional horns of a dilemma on which these appellate judges find themselves may present an appearance that is not so satisfactory, after all.

My analysis follows a similar progression but, in contrast, essentially is in the opposite direction. Regrettably, I must candidly acknowledge the serious flaws in the fitness-report system that relate to the challenge here to the appearance of impartiality of these appellate judges and then, in that context, inquire whether a reasonable person might question the judges' objectivity in this particular case. In the process, I ultimately get to the same finishing point in this case as the majority, but my course there is starkly different.

## I

RCM 902(a), Manual for Courts–Martial, United States, 1984, commands: "[A] military judge shall disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned." Title 28 USC § 455(a), from which RCM 902(a) was borrowed, *see* Drafters' Analysis, Manual, *supra* at A21–46, substantively is identical: "Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." As we have said: "This standard is objective.... Thus, the test is whether a reasonable person who knew all the facts would question [the judges'] impartiality." *United States v. Kincheloe,* 14 MJ 40, 50 (CMA 1982) (citations omitted); *accord, e.g., United States v. Cooley,* 1 F.3d 985, 993 (10th Cir.1993).

that is set out in RCM 902(a), Manual for Courts–Martial, United States, 1984, and 28 USC

It would seem, then, that the first task would be to identify our hypothetical "reasonable person." By definition, since he is in possession of "all the facts," that person is neither irrationally jaundiced against the fairness of the military justice system nor, just as importantly, dogmatically indoctrinated in support of it. Rather, the person has sufficient rationality, experience, and distance to objectively permit a view of the system through clear lenses, which hide neither the system's strengths nor its flaws.

Thus defined, what does our reasonable person think about all this? The majority relies upon four "fact[s] or circumstance[s] of which a reasonable observer would be aware" to justify its conclusion "that a reasonable person could not question the impartiality of the appellate military judges...." 39 MJ at 144. In my view, our reasonable person would not be satisfied with either the quality or the limitation of the four factors selected by the majority.

## A

First, the majority points out the obvious: The person being evaluated here is a military judge—"a military officer who has sworn to do his duty under law...." 39 MJ at 144. Such chest-pounding adds little to the balance. A similar type of claim that seems to suggest some sort of inherent integrity may be made of most any judge in most any judicial system in this country.

Moreover, the reports of decisions of this Court for the past four decades are peppered with instances of honorable persons—line officers, lawyers, judges, and even high-ranking officers of the Judge Advocate General's Corps—who affected the trial or appeal of cases in ways in which they undoubtedly at the time believed were permissible but which this Court ultimately condemned. Parenthetically, while our reasonable person knows that violation of this sworn duty "could ... expose these military officers to criminal liability under the Uniform Code of Military Justice," 39 MJ at 144–45, our reasonable person also knows that there is *no* reported

§ 455(a).

prosecution of *any* officer for *any* of the transgressions just mentioned. *But cf.* H. Moyer, *Justice and the Military* § 3–361 at 779–80 (1972).

Thus, the first factor upon which the majority relies begs the question: If such a person of apparent integrity who is sworn to do his duty under law is placed in a situation in which his own personal and professional future might seem to depend upon doing his duty in a *particular* fashion, is our hypothetical reasonable person troubled by such a psychological tug of war?

Second, the majority then reminds us that, regardless of who prepares or signs a judge's fitness report, the evaluator legally "could not consider the judge's findings or sentencing decisions." 39 MJ at 145. *I* know that is the law, *see United States v. Mabe,* 33 MJ 200 (CMA 1991). Further, in the absence of contrary evidence, *I* am willing to presume that the Judge Advocate General and others involved in this process are men and women of integrity who know and will follow the law.

Candidly, however, the picture is far from focused as to what *are* the criteria on which appellate judges are rated—officers whose full-time job is to make findings and sentencing decisions. More than one judge below expressed *pointed concern* in this regard. *See infra.* I cannot help but wonder whether our reasonable person would be so fully assuaged as the majority when faced with the fact that, while judges cannot lawfully be rated on their findings and sentencing decisions, year in and year out they *are* rated against *some* criteria and on *some* basis—the nature of which even the appellate judges below in this case expressed uncertainty and reservations.

The third "fact or circumstance" relied upon by the majority is a legitimate consideration. True, a military judge who feels importuned upon does have legal remedies available, and to be sure judges have on occasion sought their refuge. *See, e.g., United States Navy–Marine Corps Court of Military Review (hereafter NMCMR) v. Carlucci,* 26 MJ 328 (CMA 1988). Equally it is true that no judge in this case disqualified himself because of the fitness-report system.

I cannot help but wonder, though, whether our hypothetical reasonable person might find this a bit circular: The availability of certain protections against influence that assuredly require intestinal fortitude to invoke would not seem to offer substantial assurance that all judges who might not make that measure of fortitude could resist the improper influence. In other words, the irony is that judges who are of such character that they would invoke the remedies are the very judges who likely would resist the influence—and vice versa. After all, each of us is different from the other in the whole panoply of traits, and steeliness of resolve is no exception. I think our hypothetical person is not so naive as to be unaware of this realization.

The final factor pointed to by the majority is that no judge in this case expressed the personal view that either the Judge Advocate General (JAG) or the Assistant Judge Advocate General for Military Law (AJAG) generally was biased for the prosecution and that this appellant has pointed to nothing in particular in this case to suggest that the judges who sat on his appeal actually might be biased. That certainly is true; but, of course, if it were not, we would have little occasion to concern ourselves with appearances of partiality to our reasonable person—recusal of the judges pretty clearly would be required. *See* RCM 902(b)(1); 28 USC § 455(b)(1). Accordingly, absence of this factor likely would spell doom to the integrity of the decision below, but presence of it is not much affirmative comfort.

In this evaluation of the majority's four considerations, I do not mean to suggest that any particular person, whether judge or Judge Advocate General, lacks appropriate strength of character to do the right thing. Neither do I mean to suggest that the four factors are not legitimate considerations. I do mean, however, to put those four factors in perspective and to put appropriate distance between particular judges and Judge Advocates General, on the one hand, and our hypothetical reasonable person, on the other—thereby achieving some measure of objectivity.

B

The majority's analysis of the reasonable person's view of this matter suffers additionally from failure to put onto the scale several other factors that the majority expressly or implicitly acknowledges elsewhere in its opinion. It suffers, too, from oversight of the public record with regard to those factors. The assault on the system no longer depends upon hypothetical horror stories; instead, the parade of horribles now is documented, and the cries for reform appear to be compelling.

Example: A former judge of the Court of Military Review, an officer with extensive military justice experience, openly and in a sworn affidavit has averred his belief that his performance evaluation—and consequently his assignments and his promotion prospects—were adversely affected by his role in *NMCMR v. Carlucci, supra*. The fact that that judge did not sit on appellant's appeal, as the majority notes, does not detract from the impact of this document on the shaken confidence in the system of our reasonable person.

Example: The then-AJAG has sworn in his own affidavit that, when he told this same judge that he was being reassigned from the court at a point well short of the usual 3–year tour of duty, *but see United States v. Graf,* 35 MJ 450 (CMA 1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 917, 127 L.Ed.2d 206 (1994), that judge threatened to "use *Billig* [2] to prevent the move from taking place." The affiant's purported response was to return to his office and cancel the planned transfer, even though he insists that the transfer was for sound and articulable reasons other than the judge's judicial performance.

Example: The newly assigned AJAG was, before that assignment, a military judge in, presumably, a good number of cases which likely will be reviewed by the Court of Military Review while that officer is AJAG. In one such case presently pending in that court, *United States v. Larson,* NMCMR No. 92–1621, the accused has challenged several rulings of the military judge at his court-martial. Thus the mix: The military judge who the Court of Military Review is being asked to hold committed prejudicial error is now the officer who writes the fitness reports on all judges on that court for the JAG's signature and, as well, is the officer who is in the same rating group as the Marine judges on that court and who ranks himself in comparison to those judges in his draft recommendation to the JAG.

Example: The convening authority in *United States v. Larson, supra*—a case in which the accused also alleges prejudicial post-trial delay of 198 days between the end of his trial and that convening authority's action—was the same officer who now is the Assistant Commandant of the Marine Corps—the reviewing officer for the fitness reports of the Marine judges on the Court of Military Review.

Example: The various opinions below in this case, 37 MJ 903 (1993), clearly reflect the judges' substantial discomfort concerning the perception of their impartiality, given the structural flaws discussed earlier. Just a few illustrations:

> Suffice it to say that *we acknowledge that such an appearance [problem] may exist [from the fitness report system],* and we urge the Judge Advocate General to examine the process with a view to *ensuring that those who participate in it occupy positions less directly affected by the decisions of this Court....*

37 MJ at 917 n. 14 (emphasis added). The opinion goes on to say:

> We also invite the JAG's attention to two other aspects of the process that may contribute to an *unhealthy appearance:* 1) The AJAG is include with the Court's Marine judges for comparison rankings, yet he is the officer who submits recommendations for their reports, and 2) the reviewing officer for Marine judge fitness reports is the Assistant Commandant of the Marine Corps. In our opinion, *the latter fea-*

---

**2.** *United States v. Billig,* 26 MJ 744 (NMCMR 1988)(*en banc*), was the decision of the Court of Military Review that precipitated the events lead-ing to *NMCMR v. Carlucci,* 26 MJ 328 (CMA 1988).

*ture is not consistent with the concept of judicial independence and the inherent conflict in the first aspect tends to detract from the integrity of the fitness report process as a whole.*

*Id.* at 917 n. 14 (emphasis added). Other judges stated:

Unless the rating and ranking of appellate military judges is accomplished by the Judge Advocate General based on clearly stated criteria applicable to their unique, independent function in the military *(and only with the assistance of persons having no arguable interest, official or otherwise, in the outcome of cases before the Court),* military appellate review will not enjoy the confidence in its integrity and independence that Congress and the public require....

*Id.* at 921 (Mollison, J., joined by Orr, S.J., and Lawrence, J., concurring in part and in the result)(emphasis added). Another judge stated:

Thus, when the JAG needs input on the performance of military appellate judges he logically turns to the person he has designated as responsible for military justice matters, the AJAG. *However, because of his own interest in the outcome of the fitness report system and his possible disagreement with opinions from this Court, in submitting recommendations the AJAG is placed in an untenable and possibly compromising position.*

*Id.* at 930 (Reed, J., concurring in the result) (emphasis added).

Example: Even though this Court in *United States v. Mabe,* 33 MJ 200 (1991), held that military judges may not be rated in their fitness reports by using their decisions and sentencing as benchmarks, military judges (trial and appellate) continue to be rated "in several key areas of performance, including some arguably relevant to this issue, such as loyalty (USMC), cooperation (USMC), organizational support (USN), working relations (USN), and judgment (both)." 37 MJ at 905. Yet, as suggested earlier in this opinion, it is far from clear how a judge's fitness can overlay these yardsticks without violating *Mabe,* and the appellate

judges below at several points expressed such uncertainty as to precisely *how* and upon what lawful *bases* their performance is evaluated. *See, e.g.,* 37 MJ at 917 n. 14; at 921 (Freyer, S.J., concurring); at 924 (Reed, J., concurring in the result). One judge even went so far as to suggest:

The practice of ranking appellate judges should be discontinued. *In the absence of specific objective criteria, "an objective, disinterested observer fully informed of the facts would entertain a significant doubt that justice was being done" and would perceive an appearance of command influence.*

37 MJ at 930–31 (Reed, J., concurring in the result)(footnote omitted).

In a letter to the President of the United States dated July 21, 1992, the American Judges Association submitted:

It is the sense of the American Judges Association that our Judicial Brethren [in uniform] are not adequately protected from the bureaucracy of the military organization under existing service personnel policies and applicable legislation....

I have attached a copy of that letter as Appendix A to this opinion so that all may see for themselves that this group of largely state and local civilian judges has a sound grasp of the military justice system and a reasonable, moderately expressed sensitivity to the imperative of judicial independence—and to the perception of compromise of that imperative in the instance of military judges. The force of the views and to the call for reform from an organization such as this is imposing.

That is the documented public record. It can no longer be claimed, in the face of such stark evidence to the contrary, that the present structure does not have the potential for corroding confidence in our system of justice.

C

As was reported in the January 1993 issue of *Military Justice Gazette* (published by the National Institute of Military Justice), the Chief Judge of this Court requested an advisory opinion from the Committee on Codes of

**152**

Conduct of the Judicial Conference of the United States in June 1992. The opinion he sought addressed what he described as a "serious conflict of interest in the judicial reappointment system of our Court" that "was exposed in 1990 by the Federal Court Study Committee" and that has been "recognized" by the "American Bar Association and other public entities."

"In order to reduce the conflict to practical application," the Chief Judge posed a hypothetical situation to the Advisory Committee. The full text of the Chief Judge's letter and the response from the Advisory Committee may be read in the copy of the *Gazette* that is Appendix B to this opinion.

In essence, the hypothetical portrayed a Judge of this Court who is near the end of the Judge's term of office and who desires reappointment. The Judge realizes that the Department of Defense (DoD), a component of which is a party in every case before the Court, "has the responsibility for recommending to the President individuals to be appointed to" this Court; and the Judge is concerned that the "pending reappointment request will be perceived as a personal bias toward the Department of Defense" in a very-high-visibility case on which the Judge soon will sit—an adverse decision in which might "seriously undercut" a top-level, controversial DoD policy.

The Advisory Committee responded, in pertinent part, as follows:

Canon 3C(1) of the Code [of Conduct for United States Judges, which the United States Court of Military Appeals has adopted], provides that a judge should recuse in any case in which the judge's impartiality might reasonably be questioned. We believe that a litigant opposing the Department of Defense in a case before your court might reasonably question the impartiality of a judge to sit on his case when the judge is seeking the approval of the Department of Defense for the judge's reappointment. Accordingly, we would advise that Canon 3C(1) requires recusal in the situation you describe.

It is not immediately apparent to me how the personal and professional predicament in which the Court of Military Review judges are placed is any less compromising. The difficulty is not in whether either the Judge on this Court in the scenario described to the Advisory Committee or a judge on the Court of Military Review in the context that I have set forth actually *is* swayed. Rather, it is whether, from an objective viewpoint, a reasonable person would question the judge's impartiality.

By way of postscript of sorts to my treatment of the appearance problem that engulfs the fitness-report system applied to Navy and Marine appellate judges, let me conclude by quoting the following reflection and exhortation from the separate opinion below by Senior Judge Freyer:

The old (and quaintly gender-specific) fitness report form, NAVPERS 1611/1 (Rev. 12–69), contained a marking category called "moral courage," which it defined as "To do what he ought to do regardless of consequences to himself." When all is said and done, that is what was required of a military trial or appellate judge before *Mabe* and *Graf,* and it is equally required now. As desirable as moral courage may be, however, the presupposition that there should be adverse consequences to oneself for doing what one ought to do suggests that something is wrong. The administrative framework in which the military judiciaries operate should promote judicial independence affirmatively, not by taxing the moral courage of the judges to compensate for adverse structural conditions, which, by their very existence, create a perception of judicial self-interest in the outcome of decisions among the judges themselves, accused, and members of the public.

37 MJ at 921.

II

Two different approaches suggest themselves toward resolving this issue. The first is to acknowledge the flaws in the fitness-report system that relate to the challenge here to the appearance of impartiality of the appellate military judges and proceed to determine, in each and every case and in the

unique context of that case, whether indeed a reasonable person might question the judges' impartiality in light of those flaws. The second is to acknowledge those same flaws and to conclude that they constitute such a serious compromise of the insulation of neutrality that should enshroud the Court of Military Review that they permeate the whole atmosphere in which the judges of that court do their work and thereby undermine the appearance of reliability in their decisions. *See United States v. Allen*, 33 MJ 209 (CMA 1991); *United States v. Thomas*, 22 MJ 388 (CMA 1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987).

Ultimately, I am persuaded that a case has not been made that warrants the second approach. As the majority opinion points out in a footnote, 39 MJ at 146 n. 9, we have been assured by counsel for the Government that changes are underway that purportedly will address the more glaring problem areas in this system of fitness reports for the judges. In this context of apparent efforts to resolve the problem, I am willing to restrain the scope of judicial probing to those cases in which an appellant urges that his review by that court has been compromised in some manner by the problems uncovered here.

As the majority indicates, this appellant has made no such special claim here. Although our hypothetical reasonable man knows all of the facts and circumstances that I have discussed, *supra*, I am satisfied that nothing about this particular case should cause him to question the objectivity that the appellate military judges brought to their consideration of this appeal. On that basis, I join the disposition ordered by the majority.

154

 **American Judges Association**

*Serving the justice system since 1959*

President
Judge Richard Lee Price
New York Supreme Court
851 Grand Concourse
Bronx, NY 10451

President-Elect
Judge Joseph Burtell
19th District Court
16077 Michigan Avenue
Dearborn, MI 48126

First Vice-President
Judge Thomas A. Clark
Seattle Municipal Court
Public Safety Building
Room 106
Seattle, WA 98104

Second Vice-President
Judge John A. Mutter
Municipal Police Court
P.O. Box 14103
East Providence, RI 02914

Secretary
Judge Martin E. Kravarik
Superior Court of New Jersey
Middlesex County Court House
New Brunswick, NJ 08903-0964

Treasurer
Judge S. J. Elden
15th District Court
100 N. 5th Avenue
Ann Arbor, MI 48104

Immediate Past President
Judge Leslie G. Johnson
Administrative Office of the Courts
817 South Court Street
Montgomery, AL 36130-0101

Secretariat
National Center for State Courts
300 Newport Avenue
Williamsburg, VA 23187-8798
(804) 253-2000

July 21, 1992

President George Bush
Commander-In-Chief
The White House
1600 Pennsylvania Avenue N.W.
Washington, D.C. 20500

Dear President Bush:

I submit the attached Resolution of the American Judges Association (AJA) for consideration in my capacity as the Association's President. In behalf of the Association, which boasts a membership of approximately 3,000 Judges, we request that you initiate action to eliminate perceptions which exist in the current military justice system that military judges are not independent. The AJA takes the position that this perception is fostered by the lack of tenure for military judges, and the military promotion and retirement systems as they presently impact on military service judges. The personnel systems create perceptions that officers selected for, and assigned to judicial duties, do not promote at the same rate as contemporaries, and that they are selected for early retirement at a higher rates than contemporaries.

Tenure for Military Judges is a concept that has been argued before the highest Court within the Military Courts System. (United States v. Ronald D. GRAF, U.S.C.M.A. Dkt. No. 66766/NA). I have attached a copy of a recent news article which describes the April 7 arguments on the issue of tenure before the United States Court of Military Appeals.

In each of the services, Military Judges are screened for judicial temperament before they are selected for judicial duties. Thereafter they are trained and assigned to the service Trial Judiciary where they sit as judges. They are professionals who must exercise independent judicial discretion to ensure defendants, and the Government, are treated fairly in Court-Martial proceedings. The perception is that without tenure, a military judge is subject to transfer from the service judiciary should he/she render unpopular evidentiary rulings, findings, or sentences. There is no protection from retaliatory action by dissatisfied superiors in the chain of command.

---

*independent organization for all local, state, and federal judiciary
of judges—by judges—for judges*

Similarly, the perception exists that judges who make rulings unpopular with military hierarchy are endangering their possibilities of promotion because that same hierarchy is the system which makes selections for promotion.

To protect military judges from the possibility of such action, we are of the opinion that a legislative "fix" should be passed to eliminate the perception that a military judge could fall victim to retribution because of unpopular judicial decisions. In the day of the declining military presence and involuntary selective early retirements for military personnel, it is recommended that officers screened and selected for Judicial assignments at the rank of Lt Colonel/Commander be exempt from the Selective Early Retirement program, and that, as members of the Judicial Profession, they be guaranteed promotion to 0-6 (Colonel or Navy Captain) and tenure to complete a 30 year career, should the Judge elect to remain on active duty, as a Judge, until he or she reaches the 30 year mandatory retirement date.

In the alternative, or in conjunction with the foregoing recommendation, a legislative "fix" should be considered wherein the Chief Judges of the service Trial Judiciaries, and the Chief Judges of the Service Appellate Courts be: 1) selected as General/Admiral (0-7) to ensure that they are immune to the pressures of service promotion and retention systems, or 2) that the Chief Judges be retired at the rank of General/Admiral (0-7), with or without retired pay at the rank of General/Admiral.

It is the sense of the American Judges Association that our Judicial Brethren are not adequately protected from the bureaucracy of the military organization under existing service personnel policies and applicable legislation. To achieve separate, independent status the AJA deems healthy for any Judiciary, the 145 or so officers presiding over the criminal trials must be guaranteed a capability to function within, but independent of the military organizations they serve.

Military Judges are a small group of professionals, selected and designated as Judges to ensure that the perceived evils of the military justice system, as manifested in some notorious trials of the past, cannot occur in modern time.

Because these dedicated men and women deviate from a normal career pattern in order to ensure justice within the military community, they should enjoy protected careers, just as they protect the rights of persons and parties appearing in their courts. Guaranteed promotions, based on the judicial selection process, and assured status (tenure) until retirement is not too much to urge on the lawmakers and policy makers of our great nation.

Respectfully,

Richard Lee Price

156

## APPENDIX B

# MILITARY JUSTICE GAZETTE

*Published Occasionally by the*
## NATIONAL INSTITUTE OF MILITARY JUSTICE

No. 5        *Washington, D.C.*        January 1993

*NEW BOOKS*

Two new books have appeared on military justice. The first is Professor David A. Schlueter's third edition of *Military Criminal Justice: Practice and Procedure*, available from Michie Company, in Charlottesville. The other is the first volume of *Arming Military Justice*, Professor Jonathan Lurie's history of the Court of Military Appeals, published by Princeton University Press. The title of volume one is *The Origins of the United States Court of Military Appeals, 1775-1950*. Volume two is in progress. On a sadder note, we now report that, as feared, the *Military Law Reporter* has been discontinued as a result of reduced subscriptions.

*BAR NEWS*

*Gazette* No. 4 reported that Coast Guard appellate defense counsel G Arthur Robbins (now in private practice) had submitted to the Joint Service Committee on Military Justice a proposal for *Manual* changes. A report and recommendation on this subject by the ABA Standing Committee on Military Law will be considered by the House of Delegates in Boston in February. Report No. 107A urges amendment of RCM 1112 and 1201(b) "to ensure that convicted service members have the right to review and comment on all stages of military administrative review of their case" and amendment of RCM 1203(c) "to provide for the opportunity for convicted service members to review and submit petitions to the appropriate service Judge Advocate General for certification of a case to the United States [Court] of Military Appeals."

*E STREET*

1. *Advisory Opinion of Judicial Conference Committee on Codes of Conduct.*

June 22, 1992

*To the Committee on Codes of Conduct of the Judicial Conference of the United States*

Dear Judge and Committee Member:

I request an advisory opinion on a conflict of interest question that could appear before the Court on which I sit. This advice will help me devise legislation to resolve the perceived conflict. Some background information. I am the Chief Judge of the only Article I Federal appeals court. Our Judges serve a 15 year term and can be reappointed by the President with the Advice and Consent of the Senate. As you know, our jurisdiction covers criminal appeals from Federal convictions by court martial in the Armed Services. There are usually only two parties in every appeal, the appellant (servicemember) and the Government (the Department of Defense). Some of the cases we review involve the most serious Federal crimes including murder, rape, and espionage. I am told we now have nine capital murder cases in the military justice system. In each of the past two years we have handled a death penalty case. Congress has given the Chief Justice the power to designate Article III judges to sit on our Court in the event of a recusal of one of our Judges. This recusal procedure has been easily utilized several times in the last two years and with great success. Judges Sentelle, Wilkins, and Sporkin have sat with our Court using this procedure.

A serious conflict of interest in the judicial reappointment system of our Court was exposed in 1990 by the Federal Court Study Committee. The American Bar Association and other public entities have also recognized and are concerned with this conflict of interest. In order to reduce that conflict of interest to practical application, I seek an advisory opinion of the Committee on Codes of Conduct for the following question:

A United States Court of Military Appeals Judge (56 years old) is in the 14th year of her 15 year term appointment. The Judge is eligible and qualified for reappointment and has decided to seek reappointment. It is a matter of public knowledge that the Judge has requested the Department of Defense to reappoint her pursuant to [10 USC § 942]. The Department of Defense has the responsibility for recommending to the President indi-

viduals to be appointed to any vacancies on the U.S. Court of Military Appeals.

If the Judge is reappointed, her salary would remain at the present $137,300 level. If the Judge is not reappointed, she would receive no salary and $109,800 as an annuity. The Judge learns that one of the next month's oral argument cases is an important, high visibility case for the Department of Defense. If the Government loses, the outcome of the case may seriously undercut the Department of Defense's policy banning homosexuals serving in the military. The Judge is concerned that her pending reappointment request will be perceived as a personal bias toward the Department of Defense. Should this Judge recuse herself from sitting on this case? . . .

EUGENE R. SULLIVAN

COMMITTEE ON CODES OF CONDUCT OF THE JUDICIAL CONFERENCE OF THE UNITED STATES

*Re*: Docket No. 891         July 6, 1992

Dear Chief Judge Sullivan:

You ask our advice as to whether a judge of your court should recuse him or herself in a case involving the Department of Defense where the judge's 15-year term on the court is about to expire and the judge has made known a desire to be reappointed. You advise that, as a matter of consistent practice, reappointments to your court are made by the President only upon recommendation of the Department of Defense and that while a retired judge of your court is entitled to a pension, that pension is substantially less in amount than the salary a judge would receive as a result of a reappointment to your court. You further indicate that the judges of your court have (1) adopted the Code of Conduct for United States Judges as a source of standards of con-

duct for judges of your court and (2) requested our Committee to give advice regarding the application of that Code upon the request of any member of your court.

Canon 3C(1) of the Code provides that a judge should recuse in any case in which the judge's impartiality might reasonably be questioned. We believe that a litigant opposing the Department of Defense in a case before your court might reasonably question the impartiality of a judge to sit on his case when the judge is seeking the approval of the Department of Defense for the judge's reappointment. Accordingly, we would advise that Canon 3C(1) requires recusal in the situation you describe.

WALTER K. STAPLETON

2. *Judicial Terms of Office*. The Court ruled in *United States v. Graf* that due process does not require that judges have fixed terms of office. A petition for certiorari was filed on December 28, 1992.

3. *Judicial Appointments*. In *United States v. Weiss*, the Court on December 21, 1992 rejected the contention that the arrangements under which military trial and appellate judges serve violate the Appointments Clause of the Constitution. There were four opinions, none of which commanded a majority. The vote to affirm was 3-2.

*RULE CHANGE PROPOSALS*

The Appellate Government Division of the Navy-Marine Corps Appellate Review Activity is proposing a change in the Court's Rules regarding the precedential effect of memorandum actions. It is to be assumed that this proposal, the National Institute's January 1992 proposal concerning petitions for review that cite no errors, and a suggestion that the time limit for extraordinary relief petitions should not apply to *error coram nobis* will be referred to the Rules Advisory Committee.

• • •

National Institute of Military Justice
c/o Kevin J. Barry, Esq.
13406 Sand Rock Court
Chantilly, Virginia 22021